858 F.2d 1104
 Blue Sky L. Rep. P 72,923, 57 USLW 2331,
Fed. Sec. L. Rep. P 94,094,
RICO Bus.Disp.Guide 7067
 Edward C. ABELL, Jr. and Carey Walton, Plaintiffs-Appellees
Cross- Appellants,
v.
POTOMAC INSURANCE COMPANY, et al., Defendants,
Joe E. Fryar, Wright, Lindsey and Jennings, and Valley Forge
Insurance Company, Defendants-Appellants
Cross-Appellees.
 No. 87-4260.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 2, 1988.
Rehearing and Rehearing En Banc Denied Dec. 14, 1988.
 
 J. Minos Simon, Lafayette, La., for Fryar.
 D. Mark Bienvenu, Lafayette, La., for Valley Forge.
 Gene W. Lafitte, Edward J. Gay, III, Julie E. Schwartz, James D. McMichael, James A. Brown, New Orleans, La., for Wright, Lindsey & Jennings.
 Leslie R. Leavoy, Jr., Alexandria, La., for All American Services, Ltd.
 Phillip A. Wittmann, Kyle Schoenkas, Judy Y. Barrasso, C. Lawrence Orlansky, New Orleans, La., for plaintiffs-appellees cross-appellants.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before THORNBERRY, WILLIAMS, and SMITH, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 This is a civil case involving securities fraud, racketeering, and pendent state law claims. The plaintiffs, a class of investors who own bonds issued by the Westside Rehabilitation Center ("Westside"), allege that Joe Fryar, Westside's developer, and Wright, Lindsey & Jennings ("WLJ"), a Little Rock, Arkansas, law firm representing the bond issue's underwriters, fraudulently caused Westside to default on its bond interest payments, ultimately causing the bondholders to lose millions of dollars. After a two-month trial, the jury returned a multi-million-dollar verdict in favor of the plaintiffs and against Fryar, WLJ, and their two co-defendants, All American Services, Inc. ("All American"), and Valley Forge Insurance Company ("Valley Forge"). The district court, which rejected all of the defendants' motions for judgment notwithstanding the verdict, entered judgment upon this verdict and awarded plaintiffs damages totaling approximately $15 million. All of the defendants appealed from this judgment, but we dismissed All American's appeal for failure to prosecute. We now reverse and render the judgment against WLJ and Valley Forge, and affirm in part the judgment of liability against Fryar, and remand for redetermination of damages, interest, and attorneys' fees.
 
 I. Facts as to the Merits.[1]
 
 2
 Westside, a non-profit corporation based in Cheneyville, Louisiana, was master-minded by its developer, Joe Fryar. Fryar originally conceived of Westside as a home for the mentally retarded, but he eventually changed Westside's targeted clientele to severely mentally and emotionally-disturbed patients. Fryar then prepared to translate his ideas into reality.
 
 
 3
 First, Fryar purchased 6.47 acres of land and a thirty-year-old vacant school building in Cheneyville (the "Cheneyville property") from the Rapides Parish School Board on January 3, 1978, for the sum of $100,000, its appraised value. Fryar then incorporated Westside in 1979. At its inception, Westside had no capital assets; rather, its sole source of revenue and assets initially was to be the sale of bonds. Thereafter, Westside would rely on revenues paid by the State of Louisiana Medicaid program, which revenues would be used to retire the bonds.
 
 
 4
 Fryar hired his attorney, William Skye, to prepare the incorporation papers. Although a five-member board of directors was appointed, the board never collectively made any decisions on behalf of Westside. Rather, Fryar continued to control Westside and make all its decisions, including the purchase price for the Cheneyville property and the fees to be paid Fryar. Throughout the period relevant to this appeal, Fryar continued to run Westside.
 
 
 5
 Fryar's initial problems involved obtaining a certificate of need for Westside[2] and the capital funds necessary to launch the project. Ultimately, Westside succeeded in obtaining its certificate of need, despite some opposition from officials in the Louisiana Department of Health and Human Resources. Fryar, however, found it considerably more difficult to procure capital funding for Westside.
 
 
 6
 Fryar knew that building the Westside facility and starting up its operations would cost millions of dollars. To raise the needed capital, he decided to market bonds. Initially, Fryar hired the nationally-known financial feasibility firm of Booz, Allen & Hamilton, Inc. ("Booz, Allen"), to evaluate the Westside project.
 
 
 7
 Booz, Allen dealt the Westside project its first blow. In a report dated July 23, 1979, the firm concluded that Westside was not financially feasible. Booz, Allen found several areas of concern, including (1) the possibility that the state medicaid program would impose ceilings on medicaid reimbursements; (2) the difficulties Westside would encounter in retiring its debt, since it depended entirely upon medicaid reimbursements and lacked adequate sources of working capital; and (3) the inherent faults of the Westside concept in a state whose prevailing policies required placing Westside's potential patients in group homes.
 
 
 8
 The study caused Fryar to change his targeted clientele to emotionally-disturbed and mentally-retarded patients, but even this change did not alter Booz, Allen's decision. After Fryar threatened Booz, Allen with suit because of its adverse conclusions, Booz, Allen agreed to sign a letter drafted by WLJ's predecessor as bond counsel, the Boston law firm of Mintz, Levin, Cohn, Ferris, Glovsky & Popeo ("Mintz, Levin"). That epistle noted only the change in clientele and stated that Booz, Allen's conclusions may not necessarily still be applicable. The letter from Booz, Allen did not solve Fryar's problems, because he still did not have a favorable feasibility study.
 
 
 9
 Undeterred, Fryar retained Real Estate Research Corporation ("RERC"), experienced primarily in appraising real estate, to conduct a feasibility study. RERC ultimately delivered a favorable report. Meanwhile, Fryar encountered other difficulties in effecting a bond issue to fund Westside. He initially asked the Louisiana State Bond Commission for permission to finance the project through the Louisiana Public Facilities Authority; citing a variety of concerns, the Commission declined to approve financing for Westside bonds. Shortly thereafter, Westside's bond counsel, the New York law firm of Mudge, Rose, Guthrie & Alexander, resigned. Some time later, Westside retained John W. Peck of Peck, Shaffer & Williams as the new bond counsel.
 
 
 10
 Ultimately, Fryar convinced the Town of Cheneyville to back a $12,850,000 municipal bond issue. Later, and somewhat mysteriously, the bond authorization was increased to $13,550,000. Having described Fryar's long and successful struggle to obtain backing for the bond issue, we turn to how Fryar arranged Westside's finances.
 
 
 11
 Fryar had determined that he needed to receive over $5,000,000 to renovate, construct, and operate the Westside facility for an estimated seven months until it became self-sufficient. Westside's final offering statement for the bonds indicates that Westside also planned to expend over $3,200,000 in interest payments on the bonds, over $2,100,000 for debt service, more than $1,000,000 as an underwriter's discount, and $2,459,700 for "acquisition of center." The offering statement does not reveal in explicit detail how Westside actually acquired its facilities, and the failure of the offering statement to explain that transaction more thoroughly is at the heart of this multi-million-dollar litigation.
 
 
 12
 Fryar planned to issue the revenue bonds in the following denominations and maturities:
 
 
 13
 Interest Rate No. of Bonds Face Amount Total Amount Due Date
 16.50% 7,790 $5,000 $ 8,950,000 Oct. 1, 2013
 16.25% 80 5,000 400,000 Oct. 1, 2002
 16.00% 40 5,000 200,000 Oct. 1, 1998
 14.00% 800 5,000 4,000,000 Oct. 1, 2013
 ------------ ---------------
 2,710 $13,550,000
 
 
 14
 Until late 1981, Fryar owned the property eventually used to establish Westside. In 1981, he either contacted or helped create All American, a Bermuda corporation. Frequently using the mails and the wires to communicate messages and transmit documents, Fryar and All American eventually devised a complicated transaction to dispose of Fryar's interest in the land. Fryar, who had bought the land in 1978 for $100,000, agreed to sell this land to All American for $150,000. All American then sold the land to Westside for $2,479,000--$2,000,000 in Westside bonds and the remainder in cash. All American, retaining its ownership interest in the bonds, allowed Fryar to pledge those bonds to secure Fryar's performance of his duties as the developer of the project.
 
 
 15
 This transaction accomplished several things for Fryar and All American. First, it allowed Fryar to make a 50-percent up-front profit from owning the land for only three years. Second, it produced a profit for All American of over $2,300,000--a profit which by itself was over 15 times what All American had originally paid. Third, it allowed All American to enjoy the benefits of owning $2,000,000 worth of tax-exempt municipal bonds, including the interest payments periodically due on those bonds. Finally, it allowed Fryar to claim that he had pledged over $2,000,000 of bonds to the completion of the Westside project and thus to imply that he had over $2,000,000 of his own money at risk in the project.
 
 
 16
 At this point, Fryar began to rely upon the professionals preparing the Westside bonds for market. Those professionals included Joseph Hancock and his underwriting firm, Hancock, Joseph & Daniels; Skye, Westside's attorney; Peck, whose firm of Peck, Shaffer & Williams continued to serve as bond counsel; Robert Sheddy of Swink & Co., the other underwriter for the bond issue; and Mintz, Levin, then counsel for the two underwriters. Just before Westside's scheduled closing and issuance of the bonds, Mintz, Levin resigned as underwriter's counsel, purportedly because the associate working on the Westside bond offering left Mintz, Levin to join another law firm. When that associate departed in February 1982, there were only a few weeks left until Westside was scheduled to close its bond deal with the underwriters.
 
 
 17
 Under these circumstances, the underwriters immediately hired WLJ as their counsel. WLJ at once launched into preparing the bond offering to satisfy the securities laws of two dozen or more states. At the same time, WLJ assumed strict "due diligence" duties. WLJ was responsible (to its clients, at least) for carefully reviewing the final offering statement and for interviewing all the key participants to the bond transaction and those people necessary to the success of the Westside project. According to the expert testimony of James Perkins, an experienced securities lawyer from Boston, WLJ failed seriously in its due diligence duties to investigate the bond transaction, and thus failed to uncover the details of the Cheneyville land transaction and some of the details of Westside's history.
 
 
 18
 The offering statement, which the underwriters (WLJ's new clients) prepared, contained many of the relevant facts bearing on the Westside project. However, the offering statement did not reveal everything we now know. For instance, the final offering statement did not contain any information about the Booz, Allen report.[3] Moreover, the final offering statement reported that All American had sold the Cheneyville land to Westside for $2,479,000, but it did not add that Fryar had once owned the land, nor did it report any of the details of the transaction between Fryar and All American. Finally, the offering statement reported flatly that Fryar had pledged $2,000,000 of Westside bonds to the success of the project, leaving the distinct impression, even in Menz's mind, that Fryar had purchased the bonds himself and with his own money.
 
 
 19
 On April 20, 1982, the underwriters and Westside closed the bond deal. The underwriters subscribed to the entire issue of bonds and undertook the task of selling it. The underwriters sold the bonds at approximately par value (except for the 14% bonds, which were sold at a discount). The underwriters found no difficulty in selling Westside bonds, and the entire issue was marketed quickly.
 
 
 20
 Two of the new investors in Westside bonds were plaintiffs Carey Walton and Edward Abell, both of whom testified that they bought their bonds from Dick Hardwick, a broker for Swink. Walton said he relied upon the integrity and competence of the broker, with whom he had dealt before, and upon a flyer Swink had circulated without WLJ's advice, knowledge, or control. Abell testified that he relied upon Walton's glowing reports and Walton's confidence in Swink and its broker.
 
 
 21
 Both Abell and Walton testified that they would have evaluated Westside bonds differently had they known about the Booz, Allen study, the details of the Cheneyville land transaction, and the fact that Fryar had not pledged any of his own bonds or his own money to complete the project. Both witnesses stressed heavily that the developer's apparent willingness to put $2,000,000 of his own money into the project impressed them greatly and influenced their decisions implicitly.
 
 
 22
 Over the next year and a half, the Westside story began to unravel. A bank failure and several delays cost Westside a substantial sum, though no more than $300,000. A local newspaper began to uncover the details of the Cheneyville land transaction. Litigation arising from the bank failure forced Swink to send a reassuring letter to all bondholders. In that letter, dated January 20, 1983, however, Swink revealed all the information that had been withheld from the offering statements.
 
 
 23
 In early July 1984, Abell and Walton initiated this lawsuit on behalf of themselves and a class of 500 of Westside's bondholders. At that time, and for the next three months, Westside bonds continued to sell at or near their par value.
 
 
 24
 In October of 1984, Westside's financial structure finally collapsed. Westside defaulted on an interest payment on its bonds and ultimately was forced to file for Chapter XI bankruptcy in March 1985. The bondholders did not fare well in bankruptcy and, under Westside's reorganization plan, are now entitled to considerably lower interest payments than originally promised.[4] As a result of its bankruptcy, Westside missed four bond interest payments from October 1984 through April 1986, resulting in a loss to the bondholders (as of the time of trial) of $3,402,146. Moreover, the reduced interest rates for the bonds caused an additional loss of $8,616,972 after the future income was discounted to present value as of the date of the trial. Consequently, the bondholders' total losses as of trial were $12,019,118. To add salt to these wounds, All American made $2,950,000 from the land transaction and the interest payments it received on its Westside bonds.
 
 
 25
 On the basis of these facts, the bondholders claim that WLJ, Fryar, and All American violated a cornucopia of federal and state securities laws, civil racketeering laws, and a variety of state laws. They argue that WLJ and Fryar violated section 12 of the Securities Act of 1933 ("Securities Act") and the Louisiana Blue Sky Law ("LBSL"), and owe the plaintiffs rescissionary damages; that WLJ, Fryar, and All American violated the securities fraud provisions of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and rule 10b-5 (derived from section 10(b)), and owe the bondholders actual damages; that Fryar and All American operated Westside for the purpose of committing securities fraud, mail fraud, and wire fraud, and owe the bondholders treble damages for the injury Fryar and All American did to the bondholders' property; and that all three defendants committed a variety of state-law torts for which they owe the bondholders actual damages.[5] The bondholders also sued Valley Forge, WLJ's insurer, to hold it derivatively responsible for all of WLJ's liability.
 
 
 26
 The jury returned a verdict in favor of the bondholders on all counts, and the court entered judgment upon that verdict. All of the defendants appealed, but All American failed to post court costs and a bond in a timely fashion, and we have already dismissed its appeal for lack of prosecution. We now turn to the issues concerning each of the other three defendants, and to the question of whether they deserve a new trial because of jury tampering.
 
 
 27
 II. Section 12 of the Securities Act.
 
 
 28
 First, the bondholders assert that Fryar and WLJ owe them rescissionary damages under section 12 of the Securities Act, 15 U.S.C. Sec. 77l. WLJ and Fryar interpose a variety of defenses, among which is the claim that neither qualifies as a "seller" under either section 12(1) or section 12(2). Since only a statutory "seller" can be held liable under section 12, this defense, if correct, would completely absolve WLJ and Fryar.
 
 
 29
 We begin our analysis, as always, with the language of the statute itself. Under section 12, "[a]ny person who ... offers or sells a security" in violation of the section's provisions "shall be liable to the person purchasing such security from him." 15 U.S.C. Sec. 77l.[6] We do not begin with a blank slate, however, since the Supreme Court has recently interpreted this language authoritatively.
 
 
 30
 In Pinter v. Dahl, --- U.S. ----, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court decided whom courts may treat as "sellers" under section 12. Pinter, an oil and gas producer who sold securities, sought contribution from Dahl to satisfy a judgment in favor of investors who had purchased unregistered securities from Pinter. Pinter argued that Dahl should share in Pinter's section 12(1) liability,[7] since Dahl had actively promoted the securities among his friends and relatives, the disgruntled investors in the original suit. Dahl replied that he had merely recommended the Pinter securities because he had thought that they would benefit their owners. Dahl argued that he could not be a "seller" under section 12(1) because he had not acted from a motivation of personal gain.
 
 
 31
 The Court first analyzed the language of the statute which we have set out above. The Court noted that the term "seller," which includes anyone who "offers ... a security," is not restricted to those who pass title in securities to investors:
 
 
 32
 Section 2(3) defines 'sale' or 'sell' to include 'every contract of sale or disposition of a security or interest in a security, for value,' and the terms 'offer to sell,' 'offer for sale,' or 'offer' to include 'every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.' 15 U.S.C. Sec. 77b(3).... The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of Sec. 12.... 'The statutory terms ["offer" and "sell"], which Congress expressly intended to define broadly, ... are expansive enough to encompass the entire selling process, including the seller/agent transaction.'
 
 
 33
 Pinter, 108 S.Ct. at 2076-77 (quoting United States v. Naftalin, 441 U.S. 768, 773, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979)).
 
 
 34
 Although the Court held that the "offers or sells" phrase in section 12 does not limit greatly the scope of section 12(1), it reasoned that the "purchase from" language of section 12 further restricts the range of potential sellers. The Court held that a defendant is not a "seller" unless the defendant "would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased'...." Id. at 2077. Siding with Dahl, the Court added:
 
 
 35
 When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.' ... The language and purpose of Sec. 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.
 
 
 36
 Id. at 2078-79.
 
 
 37
 The definition of "seller," as the Pinter court has articulated it, requires us to make two inquiries: (1) Who passed title to the plaintiff or solicited the transaction in which title passed; and (2) from whom did the plaintiff buy the security? We may answer the first question according to the standards of legal parsing and linguistic analysis, but to answer the second question, we must refer to common usage.
 
 
 38
 Here, all of the plaintiffs bought Westside bonds from brokers or previous owners. Some of the plaintiffs, like Abell and Walton, bought their bonds from employees (who were brokers) of Swink & Co., one of the underwriters. It might be said that everyone who invested in the initial offering bought from the underwriters and Westside, the issuer.[8] None of the investors, however, can say that he or she bought bonds from the developer of the project which the bond issue supports, or from one of the law firms that helped to prepare the offering statement. If we apply the principles of Pinter to this case, we must hold that neither Fryar nor WLJ is a "seller" under section 12(2).
 
 
 39
 The bondholders suggest that Pinter is inapposite here. They do not deny that the "sell or offer" and "purchase from" language of section 12(2) is identical to the language the Court interpreted in Pinter. They note, however, that the Court explicitly reserved the right to interpret the section 12(2) language differently. See 108 S.Ct. at 2076 n. 20.
 
 
 40
 The plaintiffs contend that policy reasons favor divergent interpretations of the identical words of sections 12(1) and 12(2). They argue that the Court singled out section 12(1) because it imposes strict liability upon anyone who sells unregistered securities. Rather than import fault-based concepts, including proximate cause, to interpret section 12(1), the Court stuck closely to the language of section 12(1).
 
 
 41
 Thus, the Court (so sayeth the bondholders) rejected the substantial-factor test previously applied in this circuit[9] because that test defines as a "seller" anyone who proximately caused a securities transaction. The bondholders argue that the Court would accept the substantial-factor analysis to determine who is a section 12(2) seller because Congress incorporated traditional fault concepts into the elements of that subsection.
 
 
 42
 The Court, however, explicitly based its interpretation upon the plain language of section 12(1), not upon other factors, and presumably would do the same with section 12(2). Pinter teaches that
 
 
 43
 [t]he deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of Sec. 12 in the context of the total statutory scheme.... Thus, although the substantial-factor test undoubtedly embraces persons who pass title and who solicit the purchase of unregistered securities as statutory sellers, the test also would extend Sec. 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to Sec. 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person.
 
 
 44
 108 S.Ct. at 2080-81 (footnote omitted, emphasis added). Finally, the Court issued this warning:
 
 
 45
 'The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted in to law.' Touche Ross & Co. v. Redington, 442 U.S. at 578, [99 S.Ct., 2479, at 2490, 61 L.Ed.2d 82 (1979) ].... The ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest primarily on the language of that section. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472 ... [97 S.Ct. 1292, 1300, 51 L.Ed.2d 480] (1977).
 
 
 46
 Id. at 2082.
 
 
 47
 We cannot ignore so plain a command. We hold that neither Fryar nor WLJ was a "seller" under section 12.
 
 
 48
 III. Rule 10b-5 Claims.
 
 
 49
 Plaintiffs claim further that the defendants committed securities fraud in violation of section 10(b) of the Exchange Act. "To make out a claim under Section 10(b), which is based on the common law action of deceit, the plaintiff must establish (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." Huddleston v. Herman & MacLean, 640 F.2d 534, 543 (5th Cir. Unit A Mar. 1981), rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).[10] The plaintiffs claim that they introduced substantial evidence to prove each of these elements against each of the defendants.
 
 
 50
 The defendants do not assert that they never said or wrote anything false or misleading. However, the defendants do challenge the legal sufficiency of the bondholders' proof of materiality, reliance, and causation. WLJ also argues that it did not have the necessary scienter to violate rule 10b-5.
 
 
 51
 We will consider materiality first, followed by causation and reliance. Later, we will discuss WLJ's scienter arguments when we examine the potential for derivative rule 10b-5 liability under theories which the bondholders aim specifically at WLJ.
 
 
 52
 A. Materiality.
 
 
 53
 The defendants contend that the plaintiffs' complaints were not material. The defendants (but especially Fryar) question whether Westside said (or failed to disclose) anything that would have affected any investor's decision to buy Westside bonds. Defendants point out that none of the facts they distorted made any difference to investors when ultimately, in a January 1983 letter, Westside revealed all relevant facts.[11] Despite these revelations, the price (and apparently, the trading volume) of Westside bonds remained stable. Neither did the commencement of this lawsuit have any appreciable affect upon the market value of Westside bonds. From these facts, defendants conclude, as a matter of law, that the information which plaintiffs allege Westside fraudulently withheld was not material.
 
 
 54
 We begin by reviewing the standard for determining when a fact is material. For the purposes of the securities laws, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). To be a material fact, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. The court has recently adopted these tests to determine materiality in all rule 10b-5 cases. Basic Inc. v. Levinson, --- U.S. ----, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).
 
 
 55
 Given this standard, we believe that the record sufficiently supports plaintiffs' position. The jury was entitled to believe that information that would have affected the market for Westside's initial offering would not have had the same effect two or three years later. Indeed, the jury heard expert testimony that Westside could not have marketed its bonds at all had it revealed the details of the Fryar-All American-Westside land transaction or of the Booz, Allen study.
 
 
 56
 Sheddy, who on behalf of underwriter Swink helped prepare the offering statement, admitted that the unreported facts were material. The brokers at Swink's Atlanta office deemed the information so significant that they offered to buy back Westside bonds from their customers when they first learned the truth. According to one of these brokers, Fryar's assurances that his own funds backed Westside significantly enhanced the project's image as a secure investment. This evidence sufficiently supports the jury's conclusion that Abell proved that a reasonable investor would have evaluated Westside's initial offering differently had all the information been available originally.
 
 
 57
 B. Causation.
 
 
 58
 Fryar attacks the sufficiency of the evidence to prove that Westside misrepresented facts that caused its eventual bankruptcy and thus the reduction in the interest rates the bonds bore. To prove causation, the bondholders must prove
 
 
 59
 that the untruth was in some reasonably direct, or proximate, way responsible for [their] loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant[s], but are not the proximate reason for [their] pecuniary loss, recovery under the Rule is not permitted.
 
 
 60
 Huddleston, 640 F.2d at 549 (footnote omitted).
 
 
 61
 Fryar asserts that the facts Abell would like to have known when Westside first offered its bonds have nothing to do with the causes of Westside's default on interest payments or its eventual bankruptcy.[12] He blames the bankruptcy of Penn Square Bank, which he contends dramatically affected Westside's cash position at a critical point in the project's development. Fryar argues that a change in state health-care reimbursement policies destroyed whatever hope Westside had of weathering its cash flow crunch. According to Fryar, these two combined factors forced Westside into bankruptcy.
 
 
 62
 The jury, however, found otherwise. The Cheneyville land transaction consumed a substantial portion of Westside's working capital. Of a $13.5 million bond offering, nearly $2.5 million--most of which Fryar and All American secreted for their own undisclosed use--was dedicated to this single transaction. In comparison, the Penn Square Bank failure cost Westside only $300,000 at most. Indeed, Fryar's own witness conceded that state health-care officials froze reimbursements to Westside when they first learned of the true details of the Cheneyville land transaction. The jury was entitled to believe that this real estate deal "touched upon" the reasons for Westside's ultimate bankruptcy.[13] Hence, causation was sufficiently established.
 
 
 63
 C. Reliance.
 
 
 64
 The defendants also argue that the plaintiffs failed to prove that any plaintiff relied upon any fraudulent representations or omissions. The element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a "reasonable" investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it actually based its decisions upon the defendants' misstatements or omissions. "Reliance is causa sine qua non, a type of 'but for' requirement: had the investor known the truth he would not have acted." Huddleston, Id. at 549 (footnote omitted). Thus,
 
 
 65
 [c]ourts sometimes consider the reliance component of the Rule 10b-5 action to be a part of the causation element. In this context, the term 'transaction causation' is used to describe the requirement that the defendant's fraud must precipitate the investment decision.... On the other hand, 'loss causation' refers to a direct causal link between the misstatement and the claimant's economic loss.
 
 
 66
 Id. at 549 n. 24 (citation omitted).
 
 
 67
 1. Proving Reliance for the Class as a Whole.
 
 
 68
 Since rule 10b-5 plaintiffs must prove that each plaintiff subjectively relied upon the defendants' misstatements and omissions, the jury may not infer the reliance of an entire class of plaintiffs from the testimony of a few. "Consequently, in a class action, while the materiality element can be established for the class as a whole, reliance, like damages, is a matter of individual proof." Huddleston, Id. at 549 (citation omitted).
 
 
 69
 Here, neither side introduced any evidence to demonstrate or refute whether most of the class members decided to buy Westside bonds in reliance upon what the defendants said or failed to say. Whether the jury was permitted to infer reliance from the evidence, therefore, depends entirely upon who bore the burden of persuasion. That burden ordinarily rests with plaintiffs, but it may shift in those rare cases in which plaintiffs can prove that they are entitled to one of two presumptions.
 
 
 70
 The more venerable presumption, the so-called Ute presumption, is available to plaintiffs who can prove that the rule 10b-5 violations which they allege actually stem from defendants' failure to disclose pertinent information rather than from defendants' failure to tell the truth. The other presumption plaintiffs may invoke--the theory that defendants committed a fraud upon the marketplace--is of more recent vintage. We discuss each of these burden-shifting presumptions in turn.
 
 
 71
 a. The Ute Presumption
 
 
 72
 The Ute presumption was first announced by the Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). There, an organization of native Americans organized a corporation to distribute its assets to its members. Each member received title to ten shares of stock that were deposited with a local bank. The bank entered into a fiduciary relationship with the new stockholders and assumed primary responsibility for enforcing title restrictions and providing other services related to the stock.
 
 
 73
 Ultimately, investors in surrounding communities developed an interest in the stock, and demand in these communities outstripped the Utes' demand for the corporation's stock. The bank seized this opportunity quietly to build a non-native American clientele eager to invest in Ute stock. The native Americans, however, never heard about this secondary market for their stock, and the bank chose to keep them ignorant to exploit its potential financial gains.
 
 
 74
 When the Utes eventually did learn of the bank's scheme, eighty-five of them sued. The plaintiffs were Utes who, trusting in the bank, had sold their stock to the bank for prices that sometimes were significantly lower than what the bank could command in the open market. The native Americans complained that the bank had breached a fiduciary duty to them to disclose information about the secondary market, and sued the bank for violating rule 10b-5. The bank responded in part by arguing that the plaintiffs had failed to prove reliance.
 
 
 75
 The Supreme Court held that the burden of proving reliance fell on the bank, not on the plaintiffs. As our subsequent cases have taught, the Ute presumption attaches only to those rule 10b-5 actions based primarily upon omissions rather than misrepresentations.[14]
 
 
 76
 Misrepresentations include statements that are themselves false--outright lies--and true statements that are nonetheless so incomplete as to be misleading, i.e., distorted half-truths. To omit a fact, however, is to say absolutely nothing about matters whose very existence plaintiffs have no reason to consider. The bank in Ute omitted material facts: The Utes simply had no idea that the bank itself actively solicited non-native-American investors to buy Ute stock.[15] These omissions were not distorted half-truths, since the bank never made any statements regarding its activity in the secondary market.
 
 
 77
 Our cases indicate that the Ute presumption is limited to cases, like Ute itself, in which the plaintiffs have based their complaint primarily upon alleged omissions. Such non-disclosure suits are those in which the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose. Ute, however, does not require the burden of persuasion to shift in cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true but misleading incomplete statements. Thus, we apply the Ute presumption in non-disclosure cases, but not in falsehood or distortion cases. See, e.g., Finkel, 817 F.2d 359.
 
 
 78
 Here, the bondholders characterize this case as involving primarily omissions. Their claim is that the offering documents represented that Westside was feasible, when it was not; that Fryar was to have $2 million of his own money in the transaction, when he did not; and that the real estate had a value or cost basis to Westside of over $2.4 million, when it did not. Although we have held these statements to have been both false and material, they are distortions, not omissions.
 
 
 79
 The bondholders have not argued that Fryar failed to disclose facts about which the investors had no inkling, but that Fryar purposely revealed only part of the truth in an effort to mislead potential purchasers. The plaintiffs attempted to portray the defendants as creating an impression of Westside that was entirely false, induced by a deceptively misleading impression about the offering; thus, the plaintiffs are not entitled to the Ute presumption.
 
 
 80
 b. The Fraud-on-the-Market Presumption
 
 
 81
 The bondholders argue that we should assume that they relied upon the market for Westside bonds to set a fair price unadulterated by fraud. Under this theory of their case, the bondholders essentially contend that investors uniformly assume that an active and open securities market efficiently assimilates information about securities. The market then calibrates the price of a security to reflect precisely the security's value in light of all the information publicly available about that security. Provided that the publicly available information is both accurate and complete, the market price contains the most accurate and succinct estimation of the true value of any given security at any given time. Consequently, investors, who must assume the integrity of the market and of those who trade in it, ordinarily rely heavily upon the market price in determining the values of securities.
 
 
 82
 This theory of the marketplace underlies a recent development in securities law--the "fraud-on-the-market" theory of reliance. A fraud on the market is any deceit that successfully disseminates false or misleading information into the securities market or withholds vital information from that market. Such a deceit defrauds investors even when they are unaware of the misrepresentations or omissions that skew the market price, because investors depend heavily upon the integrity of the market price. Thus, the argument goes, courts should presume reliance in a class action because most (if not all) of the investors have relied upon the accuracy of a fraudulently distorted market price. See, e.g., Basic Inc. v. Levinson, 108 S.Ct. at 988-92.
 
 
 83
 In recent years, this theory of reliance rapidly has gained support. In Shores v. Sklar, 647 F.2d 462 (5th Cir. May 1981) (en banc), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), we adopted a form of the fraud-on-the-market presumption of reliance. Since Shores, the Supreme Court in Basic Inc. v. Levinson has announced its support for a new, largely undefined version of this presumption of reliance.
 
 
 84
 Basic states only three propositions of law that are of interest here. First, the Court ruled that a trial court may presume reliance on the ground that the defendant committed a fraud on the market. Second, Basic explicitly holds that the "fraud-on-the-market" presumption is rebuttable and serves only to shift the burden of persuasion, as to reliance, onto securities fraud defendants. Finally, the Court vitiated part of our fraud-on-the-market jurisprudence.
 
 
 85
 Until Basic, we made the fraud-on-the-market presumption, like the Ute presumption, available only to plaintiffs who based their rule 10b-5 claims primarily upon non-disclosure. See, e.g., Finkel v. Docutel/Olivetti Corp., 817 F.2d at 359. Basic, however, held that a rule 10b-5 plaintiff alleging active misrepresentation (i.e., making false statements and failing to correct distorted statements) may also assert a fraud-on-the-market theory of reliance.[16]
 
 
 86
 Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.... Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed.... An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.
 
 
 87
 Basic, 108 S.Ct. at 991-92 (footnotes omitted). Nonetheless, Basic essentially allows each of the circuits room to develop its own fraud-on-the-market rules. Consequently, we return to our own cases.
 
 
 88
 In Finkel, the most recent Fifth Circuit case to consider the fraud-on-the-market theory, we held that a rule 10b-5 plaintiff may establish fraud on the market in two different ways. First, the plaintiff can establish that the subject securities were traded on an active secondary market, such as a public exchange. In such a case, the plaintiff would prevail if he could prove that the defendant's non-disclosures materially affected the market price of the security. 817 F.2d at 364.
 
 
 89
 Where, however, no active, efficient secondary market existed in which to trade the subject securities (as in Shores ), the plaintiff must prove that "the defendants conspired to bring to market securities that were not entitled to be marketed." Id. at 362. Shores states this same concept in slightly different terms:
 
 
 90
 If [the plaintiff] proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover.... This theory is not that [the plaintiff] bought inferior bonds, but that the Bonds he bought were fraudulently marketed. The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place.
 
 
 91
 Shores, 647 F.2d at 470-71.
 
 
 92
 The plaintiffs here argue first that the market price, set in active bond markets, was distorted by defendants' fraud. The bondholders contend that Westside bonds were traded in an active secondary market through brokers. They add that Westside's finances, of which the public originally had only a materially distorted view, eventually caused the value of the bonds to collapse.
 
 
 93
 This argument, however, completely ignores Shores, which, in this respect, is factually indistinguishable from the present case. In Shores, as here, the defendants included private entrepreneurs who obtained a town's authorization to issue municipal bonds underwriting a local, private project. Both here and in Shores, the entrepreneurs hired underwriters to sell the new issue to the public. In both cases, a small secondary market, exploited by brokers, developed for the bonds. However, the bonds in Shores, like the bonds here, were not actively traded on any exchange or in any large secondary market. As we observed later in Finkel,
 
 
 94
 ... it is clear that the market for the bonds in Shores (industrial development bonds of the town of Frisco City, Alabama) does not represent the active, efficient market for which the fraud on the market theory was initially conceived.
 
 
 95
 Finkel, 817 F.2d at 364.
 
 
 96
 Next, the bondholders argue that they deserve the fraud-on-the-market presumption because the Westside offering was not entitled to be marketed. The bondholders point to several experts who testified that the Westside bonds were unmarketable. According to the plaintiffs' experts, Westside could not have disclosed its true financial status and the negative conclusions of the Booz, Allen feasibility study without completely losing a market for their bonds. These experts also opined that no underwriter would have been willing to shoulder Westside's offering if the weight of the task included trying to explain away Fryar's suspicious land transactions and the Booz, Allen study.
 
 
 97
 The bondholders claim that this testimony proves that, like the securities in Shores, the Westside bonds were brought to market only through fraud, and were not entitled to be marketed at all. The defendants respond that only worthless securities are not entitled to be marketed under Shores. They argue that if the bonds retained any value at all, the plaintiffs have shown "no more than that the bonds would have been offered at a lower price or a higher rate...." Shores, 647 F.2d at 470. According to the defendants, the plaintiffs' theory is only that they bought inferior bonds, not, as Shores requires, that they bought bonds fraudulently brought to market. Id. at 471.
 
 
 98
 The bondholders argue that worthlessness is not a prerequisite, under Shores, for establishing a fraud on the market. The bondholders correctly note that the Shores plaintiffs recouped about 37 percent of their investment when the municipal assets dedicated to the failed corporation were liquidated. They conclude that the Shores stocks were not worthless and that worthlessness, therefore, cannot be the touchstone of a fraud-on-the-market analysis.
 
 
 99
 This argument misses the point, since saleable assets may bless even the most worthless enterprise. In Shores, the illegitimate securities represented an investment in a hoax made to seem real because valuable assets, including a factory, backed the promoters' promises. Although the assets may have added value to the securities, the sham "business" did not because the promoters never intended to start a legitimate one.
 
 
 100
 We hold, therefore, that securities meet the test of "not entitled to be marketed" only where the promoters knew the enterprise itself was patently worthless. We add that expert testimony, however well-founded in the experience of securities traders, is nothing more than the speculation of observers benefiting from hindsight. All of the careful analysis of securities pundits and expert calculations of experienced investors cannot replace the irrefutable knowledge gained from a single source: the actual track record of the security itself.
 
 
 101
 Shores established a test more sensitive to the historic value of the subject securities than the bondholders acknowledge. As we said in Shores, a securities fraud plaintiff must argue not "that he bought bonds, but that the bonds he bought were fraudulently marketed." Id. at 471. Finkel succinctly characterized this test:
 
 
 102
 The majority in Shores simply recognized that a Rule 10b-5 action based on the fraud on the market theory could embrace a claim for a fraud that resulted in the issuance of worthless securities as well as a fraud that inflated the price of a security.
 
 
 103
 817 F.2d at 364 (footnote omitted).
 
 
 104
 Here, the bondholders' argument fails because the Westside bonds always had a legitimate value in the bond market. Indeed, these bonds remained near market value for several years after Westside disclosed the accurate version of its beginning and several months after this lawsuit commenced.
 
 
 105
 Moreover, we perceive strong policy reasons to reject the bondholders' contentions. The plaintiffs' position would attenuate the fraud-on-the-market presumption of reliance far beyond its proper bounds and almost entirely extinguish reliance as a legitimate element of a rule 10b-5 claim. This presumption assumes that investors ordinarily and correctly rely upon the "market price" of a security as an accurate estimate of the future value of that security. Accordingly, if a defendant distorts the market price by lying or concealing the truth, the fraudulently-distorted price can deceive even prudent investors.
 
 
 106
 This theory, however, implicitly assumes that there is an active, efficient secondary market capable of accurately measuring the present and future value of a security. Moreover, the theory supposes that most investors seek out securities whose prices the market accurately reflects.
 
 
 107
 Where, as here, investors seek out underpriced securities that are traded outside efficient secondary markets, the fraud-on-the-market theory of reliance no longer makes sense. Investors can no longer be said to have relied upon an established market price, which, if it exists at all, reflects an inherently unstable and probably inaccurate estimate of the security's actual value. Moreover, Abell has never argued--indeed, the evidence belies such an argument--that Westside bonds ever lacked any value. Given the inherently imprecise means available to measure the actual value of Westside bonds at any given point in time, Abell's argument that the members of the plaintiff class presumably relied upon the market price for those bonds is unconvincing.
 
 
 108
 Consequently, we reject bondholders' arguments and hold that the fraud-on-the-market presumption of reliance is available only (1) where the subject securities were traded actively in large markets, or (2) where the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme. Since the Westside bonds fail to meet either test, and since the Ute presumption is here unavailable, plaintiffs have failed to establish reliance for the class, and the class's rule 10b-5 claim must fail.
 
 
 109
 2. Reliance of Some Individual Members of the Class.
 
 
 110
 Two of the individual plaintiffs, Abell and Walton, testified that they did in fact rely upon the defendants' misrepresentations. Walton testified that he considered the attractive interest rate which the bonds bore, a Swink flyer that had not been authorized by WLJ, and the advice of Dick Hardwick, a Swink broker. Abell testified that he relied upon the attractive interest rate, Hardwick's reputation as a broker, the fact that Westside bonds were Louisiana municipal bonds, and Fryar's promise to invest $2,000,000 of his own cash in Westside. We conclude that this testimony, which was uncontradicted at trial, is enough to establish that Abell and Walton relied upon Fryar's misrepresentations. We do not, however, think that it is sufficient to prove that Abell and Walton relied upon anything which WLJ said or did.
 
 
 111
 WLJ never had any direct contract with Westside's bondholders. Consequently, the bondholders may not assert that WLJ misrepresented or failed to disclose any material facts directly to the bondholders. Instead, WLJ limited its role in the Westside bond-offering to the legal work it did for the bond underwriters. Consequently, WLJ never made any statements on its own behalf directly to the bondholders, but only checked and revised the statements made in the offering statement.
 
 
 112
 Neither Abell nor Walton testified that he relied upon that statement. Instead, their own testimony indicates that they relied only upon the attractiveness of the offer, Fryar's misrepresentation as to his own investment in Westside, and Swink's misguided (or fraudulent) assessment of the bonds' value. Neither Swink, which knew more about the bonds than it cared to reveal in the offering statement, nor Abell and Walton, who did not seem to care what the offering statement actually said, can be said to have relied upon the offering statement itself.
 
 
 113
 Consequently, none of the plaintiffs has proved that he relied upon WLJ's legal opinion, however good or bad that opinion may have been. From our foregoing analysis, we conclude that Abell and Walton have shown that Fryar and the underwriters, but not WLJ, have violated rule 10b-5 and are liable to Abell and Walton for damages.
 
 
 114
 Thus, Abell and Walton (but not the class) have shown that Fryar misrepresented material facts, that they relied upon these misrepresentations in choosing to buy Westside bonds, and that Westside's actual financial structure eventually caused Abell's and Walton's losses. Abell and Walton did not prove, however, that anyone ever relied upon anything WLJ did, said, or wrote. Thus, they have not proven that WLJ violated rule 10b-5 directly. Our analysis, however, does not suggest that WLJ is not vicariously liable for the role the underwriters played in executing Fryar's fraud.[17] We next analyze that theory.
 
 
 115
 D. WLJ's Potential Vicarious Liability.
 
 
 116
 The bondholders suggest that, under two separate theories, WLJ is vicariously liable for Fryar's and the underwriters' fraud. The plaintiffs assert first that WLJ had a special duty, as underwriters' counsel, to the investing public to ferret out and disclose publicly any fraud. Second, according to the bondholders, WLJ rendered substantial assistance to the fraudulent scheme despite the unmistakable signs that fraud was afoot. By turning a blind eye to these signs, the bondholders argue, WLJ subjected itself to rule 10b-5 liability for aiding and abetting securities fraud. We examine each of these arguments in turn.
 
 
 117
 1. Duty To Disclose.
 
 
 118
 The bondholders argue that WLJ implicitly guaranteed the accuracy of the offering statement to the investing public. According to the bondholders, WLJ impliedly assumed a duty to correct all material misrepresentations in the offering statement when it agreed to assume the responsibilities of an underwriter's counsel. Thus, the bondholders conclude, WLJ issued deficient legal opinions, subjecting it to liability, because it failed to discover and disclose Fryar's fraud.
 
 
 119
 The bondholders derived this proposition of law from four well-established practices of the securities bar. First, underwriter's counsel, acting on behalf of the underwriter, traditionally prepares the offering statement. Second, underwriter's counsel assumes a due-diligence duty to ensure that the offering statement is correct in all material respects. Third, this due-diligence duty derives from the fraud provisions of the securities laws, which themselves exist primarily to protect innocent investors. Fourth, Westside's offering statement listed WLJ as underwriter's counsel--a fact that suggests to the plaintiffs that WLJ implicitly took public responsibility for the legal sufficiency of the offering statement itself.
 
 
 120
 We cannot agree with the bondholders' argument. Traditionally, lawyers are accountable only to their clients for the sufficiency of their legal opinions. It is well understood in the legal community that any significant increase in attorney liability to third parties could have a dramatic effect upon our entire system of legal ethics.[18] An attorney required by law to disclose "material facts" to third parties might thus breach his or her duty, required by good ethical standards, to keep attorney-client confidences. Similarly, an attorney required to declare publicly his or her legal opinion of a client's actions and statements may find it impossible to remain as loyal to the client as legal ethics properly require.[19]
 
 
 121
 Cognizant of these risks, the law, as a general rule, only rarely allows third parties to maintain a cause of action against lawyers for the insufficiency of their legal opinions. In general, the law recognizes such suits only if the non-client plaintiff can prove that the attorney prepared specific legal documents that represent explicitly the legal opinion of the attorney preparing them, for the benefit of the plaintiff.[20] Goodman, 556 P.2d at 743; Bush, 619 F.Supp. at 596.
 
 
 122
 In practice, this rule has meant that an attorney is rarely liable to any third party for his or her legal work unless the attorney has prepared a signed "opinion" letter designed for the use of a third party. Compare S.E.C. v. Spectrum, Ltd., 489 F.2d 535 (2d Cir.1973) (plaintiff may state rule 10b-5 action against attorney who signed an opinion letter another had declined to sign) with Keene Corp. v. Weber, 394 F.Supp. 787 (S.D.N.Y.1975) (attorney not liable under rule 10b-5 because no misleading opinion letter at issue).
 
 
 123
 The bondholder plaintiffs argue that other courts have established less restrictive tests to determine whether securities lawyers are liable to those who invest in securities the lawyers' clients have issued or underwritten. The three most relevant are Spectrum, Cronin v. Midwestern Dev. Auth., 619 F.2d 856, 862 (10th Cir.1980), and In re Flight Transp. Corp. Sec. Litig., 593 F.Supp. 612, 617-18 (D.Minn.1984).
 
 
 124
 In Spectrum, however, the Second Circuit held a lawyer liable under rule 10b-5 because he signed a critical opinion letter which another lawyer, who escaped liability, had refused to sign. Accord, Keene Corp. (describing the holding of Spectrum ). In Cronin, the Tenth Circuit suggested that courts could impose rule 10b-5 liability upon bond counsel, who ordinarily does issue an opinion letter that comes attached to the offering statement or prospectus.
 
 
 125
 Of the three cases, only Flight Transp. Corp. squarely departs from the traditional rule to impose rule 10b-5 liability upon all underwriter's counsel. Flight Transp. Corp., however, has no precedential value here, and we find its reasoning unconvincing.[21] Since we can find no binding authority creating a special rule in the field of securities law,[22] we decline to depart from either rule or practice here.
 
 
 126
 Plaintiffs presented almost no evidence that WLJ's due diligence duties existed to benefit or protect the investing public at large. Rather, bondholders proved only that WLJ had a duty to its clients to ensure that they complied with securities laws. The mere fact that these laws were designed to protect the investing public does not convince us that WLJ assumed more than the duty to protect its own clients from legal liability. "The securities laws do not impose liability for ordinary malpractice, even though that malpractice may diminish the value of the issuer and thus of the issuer's securities." Barker, 797 F.2d at 496.
 
 
 127
 Nor do we believe that WLJ assumed any duties to these bondholders merely by allowing its name to be included in the final offering statement. We think it more significant that WLJ never signed the offering statement itself or any of the documents included in that statement. Moreover, the offering statement says only that WLJ passed on legal issues for the underwriters, its clients. By contrast, the offering statement does not limit for whom the bond counsel had prepared his opinion. If any of the attorneys or law firms assumed legal responsibility for the sufficiency of the offering statement, it was bond counsel William Skye, who actually did sign a letter disclosing his own legal opinion regarding several aspects of the bond offering.
 
 
 128
 We join the Seventh Circuit, which, in Barker, id at 497, commented:
 
 
 129
 We express no opinion on whether the [attorneys] did what they should [or] whether there was malpractice under state law.... We are satisfied, however, that an award of damages under the securities laws is not the way to blaze the trail toward improved ethical standards in the legal and accounting professions. Liability depends on an existing duty to disclose.... The plaintiffs have not pointed to any rule imposing on [attorneys] a duty to blow the whistle. [Emphasis in original.]
 
 
 130
 Accordingly, WLJ owed no duty of disclosure to the bondholders.
 
 
 131
 2. Aiding and Abetting.
 
 
 132
 Finally, the bondholders argue that even if WLJ did not itself commit securities fraud, it nonetheless aided and abetted Fryar and Swink in their scheme to commit securities fraud. As the plaintiffs correctly note, our cases impose section 10b-5 liability upon those who abet securities fraud. Woodward v. Metro Banks, 522 F.2d 84 (5th Cir.1975).
 
 
 133
 We have recently restated the Woodward test to determine who is subject to section 10b-5 aiding-and-abetting liability: (1) There must have been a securities violation by the primary party; (2) the aider and abettor must have had a "general awareness" of its role in a rule 10b-5 violation; and (3) the aider and abettor must have knowingly rendered "substantial assistance" in the rule 10b-5 violation. Bane v. Sigmundr Exploration Corp., 848 F.2d 579, 581 (5th Cir.1988).
 
 
 134
 We have already held that substantial evidence supports the jury verdict that Fryar and the underwriters committed securities fraud. Moreover, WLJ does not challenge the bondholders' implicit assertion that it substantially assisted the underwriters in effecting their scheme. Thus, it remains only to determine whether WLJ was "generally aware" of its role in furthering the fraudulent scheme, and whether its assistance was "knowing."
 
 
 135
 In Woodward, we explained what these scienter requirements mean. "General awareness," we said, means knowledge which, though it may be adduced from reckless conduct, means actual awareness. 522 F.2d at 96. We also held that how "knowing" an abettor must be depends upon how substantial the abettor's assistance is:
 
 
 136
 When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.... In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities law. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case, the assistance must be substantial before liability can be imposed under 10b-5.
 
 
 137
 Id. at 97 (citations and footnotes omitted).
 
 
 138
 Woodward appears to divide scienter into two parts: knowledge of one's role in a fraud, and commitment (or intent) to aid in the fraud's success. Scienter, then, would require first that the alleged abettor know of the fraud's existence and generally understand how its actions aid in promoting the success of the fraud. The second element of scienter--commitment--would be met where evidence shows that the abettor acts from a desire to help the fraud succeed.
 
 
 139
 Naturally, whether the plaintiff needs evidence independent of the abettor's actions to prove commitment depends upon the nature of the defendant-abettor's assistance. Silent acquiescence never indicates by itself that the abettor wants the fraudulent scheme to succeed; here, we usually require proof of 'conscious intent.' Id.
 
 
 140
 Even when an abettor takes positive actions that aid a nefarious plan, the abettor does not always approve of the scheme's success. Thus, "we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities laws" where the assistance amounts to "no more than transactions constituting the daily grist of the mill...." Id. On the other hand, those who go out of their way to aid a fraud are generally the most willing and committed to its success.
 
 
 141
 If this view of Woodward is correct, then it would harmonize the law of rule 10b-5 aiding-and-abetting with its roots in the criminal law.[23] However, both the commentators and our sister circuits view the scienter requirement as a single rule that determines both one's level of awareness and "knowing and substantial assistance" according to the same rule. See e.g., IIT, an Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 923 (2d Cir.1980) (Friendly, J.). Under this generally-accepted view, Woodward establishes a single test for scienter that varies as the level of assistance decreases on a sliding scale from recklessness to "conscious intent." Under either rule, however, we must determine whether the alchemy of WLJ's level of assistance, combined with its level of knowledge of the unfolding fraud, supports a jury verdict against WLJ. Here, we think it does not.
 
 
 142
 We review the evidence, as we must, in the light most favorable to the plaintiff bondholders. They established that WLJ knew that one of its clients (Hancock) was under S.E.C. investigation for securities violations. The evidence also permitted the jury to conclude that WLJ knew that the FBI, the S.E.C., and the National Association of Securities Dealers were also investigating Hancock. Additionally, WLJ was aware that both the original underwriter's counsel and the original bond counsel had resigned from their representations--a further sign that something might be amiss.
 
 
 143
 Nonetheless, WLJ did little to investigate what its client had done previously or why the original counsel had resigned. Moreover, WLJ readily made several material changes to the final offering statement without asking its clients (who requested the changes) why they should be made. Finally (and again, according to the evidence most favorable to plaintiffs), WLJ failed to investigate properly the truth of the offering statement despite its duty to its clients to do so.[24]
 
 
 144
 We conclude that this evidence is not strong enough to sustain the jury's verdict as to WLJ. First, in examining what WLJ did to assist in the fraud, we determine that WLJ provided only legal services that "[constitute] the daily grist of the mill" of a law firm with a substantial securities practice. Woodward, 522 F.2d at 97. Consequently, Woodward requires "clear proof of intent to violate the securities laws." Id. But at best, the evidence shows only that WLJ recklessly disregarded its duties to its clients. WLJ ignored several warning signs that the jury could have found aroused the law firm to suspect the propriety of the offering.
 
 
 145
 Aroused suspicions, however, do not constitute actual awareness of one's role in a fraudulent scheme. Moreover, to prove plainly that an alleged abettor intended to violate the securities laws, plaintiffs must prove more than that the abettor recklessly ignored danger signals.[25] Consequently, we conclude that the jury's verdict holding WLJ liable for securities fraud was not supported by the evidence, and we overturn that verdict.
 
 
 146
 IV. RICO.
 
 
 147
 The bondholders also claim that Fryar and All American violated the provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO").[26] Specifically, they repeated the allegation that Fryar committed securities fraud and also charged these defendants with mail fraud and wire fraud. The jury believed the bondholders and found that Fryar's racketeering activity had caused $850,000 damage to the bondholders. The trial judge, who apparently assumed that these damages did not duplicate the securities damages, trebled the jury's figure and awarded the plaintiffs $2,550,000 on their RICO claims.[27] Fryar attacks this judgment on three grounds.
 
 
 148
 First, Fryar asserts that plaintiffs failed to prove any compensable damages. Title 18 U.S.C. Sec. 1964(c) authorizes "[a]ny person injured in his business or property" to sue based upon the injurious RICO violations. Fryar argues that the evidence did not establish (1) any injury to plaintiffs' business or property or (2) any causal connection between the plaintiffs' putative injuries and Fryar's misrepresentations.
 
 
 149
 We disagree. Plaintiffs proved, to the jury's satisfaction, that the Westside project was less feasible than Fryar had represented, and that Fryar misrepresented key facets of Westside's financial structure. Most significantly, Fryar withheld the details of his land transaction with All American, of All American's huge profit when it resold the same land to Westside, and of his $2 million pledge, of which money none came from his own pocket.
 
 
 150
 The bondholders also developed substantial evidence to support the jury's conclusion that Westside's rickety financial structure, long hidden by Fryar's financial tricks, caused its ultimate bankruptcy. In that bankruptcy, the court reduced the bond's interest rate by nearly one-third. This is a sufficient showing that Fryar's alleged RICO violations injured the bondholders' property.
 
 
 151
 Fryar also contends that RICO requires plaintiffs to prove at least two related predicate acts arising from distinct schemes. See 18 U.S.C. Sec. 1962 (requiring a RICO plaintiff to prove a "pattern of racketeering"). Fryar's brief correctly notes that "[p]laintiffs have fashioned their RICO claim from the matrix of their securities law fraud claims." From this observation, Fryar concludes that the plaintiffs failed to prove the predicate acts necessary to establish a "pattern of racketeering."
 
 
 152
 Our cases, however, belie Fryar's legal analysis. In R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350 (5th Cir.1985), we held that RICO requires only that the predicate acts alleged be related, not that they arise from separate schemes or incidents. Here, plaintiffs have alleged over half a dozen acts of mail fraud and wire fraud, each of which stems from Westside's bond offer. R.A.G.S. requires no more. But see Montesano v. Seafirst Commercial Corp., 818 F.2d 423, 426 (5th Cir.1987); Crocker v. FDIC, 826 F.2d 347, 348 n. 2 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1075, 99 L.Ed.2d 235 (1988); Smith v. Ayers, 845 F.2d 1360, 1365-66 n. 18 (5th Cir.1988). (Each of these cases criticizes R.A.G.S., but notes that only the court sitting en banc or the Supreme Court may overturn R.A.G.S.).[28]
 
 
 153
 Finally, Fryar argues that plaintiffs failed to prove any of their wire fraud or mail fraud allegations. Fryar reasons that mail fraud and wire fraud, which he assumes incorporate all the elements of fraud, must require plaintiffs to prove materiality and reliance. He asserts that the plaintiffs have failed to establish these two elements.
 
 
 154
 Materiality and reliance, however, are not elements of either wire fraud or mail fraud. Our cases unmistakably hold that plaintiffs need prove only a defendants' fraudulent intent; the success of a fraudulent scheme is not necessary to establish mail fraud or wire fraud. To prove mail fraud, for example, a plaintiff must prove that
 
 
 155
 (1) the defendant participated in some scheme or artifice to defraud, (2) the defendant or someone associated with the scheme used the mails or 'caused' the mails to be used, and (3) the use of the mails was for the purpose of executing the scheme.
 
 
 156
 Armco Indus. Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 481-82 (5th Cir.1986) (citing United States v. Davis, 752 F.2d 963, 970 (5th Cir.1985)). A "scheme to defraud" is one "in which artifice or deceit is employed to obtain something of value...." United States v. Kreimer, 609 F.2d 126, 128 (5th Cir.1980). Thus, plaintiffs prove that Fryar intended to defraud them where they can show that defendant's plan was "reasonably calculated to deceive persons of ordinary prudence and comprehension." United States v. Finney, 714 F.2d 420, 423 (5th Cir.1983).[29] Under RICO, each use of the mails to accomplish the same scheme is a separate predicate act. See R.A.G.S.
 
 
 157
 Here, plaintiffs alleged that Fryar had repeatedly used the mails to execute a scheme to sell Westside bonds with the intent of defrauding the purchasers. The record amply supports the jury's conclusion that Fryar, intending to defraud potential investors, devised and employed a scheme to sell Westside bonds. Fryar knowingly misled prospective bondholders about a land transaction that significantly affected Westside's financial structure. He falsely suggested that he had backed the health-care project with $2,000,000 of his own money. Obviously, the jury could find that Fryar had a reasonably calculated plan to deceive persons of ordinary prudence and comprehension into giving Westside their money.
 
 
 158
 Nor does Fryar contest whether he used the mails repeatedly to execute this scheme; indeed, the evidence is overwhelming that he did. Fryar used the mails to obtain and transmit the application forms for Westside's certificate of need; to help create All American and interpose it in the transaction; and to send the land transaction documents to All American. He also caused others to use the mails to transmit the sales circulars that erroneously portrayed Fryar as purchasing and pledging $2,000,000 of bonds with his own money; and finally, he caused the mails to be used in an attempt to cover up the fraud and deceive bondholders into believing All American was performing more obligations than it had actually undertaken.[30] Thus, the evidence strongly supports the jury's RICO verdict.
 
 
 159
 V. State Law Claims.
 
 
 160
 The bondholders also urge various state grounds for imposing substantive liability upon Fryar and WLJ. They allege that defendants violated the Louisiana Blue Sky Law (LBSL) (La.R.S. 51:701 et seq.), negligently misrepresented and/or fraudulently misrepresented material facts (La.Civ.Code arts. 2315, 1953), committed fraud (La.Civ.Code art. 1953), and aided and abetted others in violating the law (La.Civ.Code art. 2324). The bondholders also claim that WLJ breached a fiduciary duty to them and committed legal malpractice. We now consider the merits of these claims.
 
 
 161
 A. Louisiana Blue Sky Law.
 
 
 162
 For exactly the same reasons that the defendants are not "sellers" under section 12, they are not "sellers" within the meaning of the LBSL. The LBSL was modeled after the federal Securities Act. Caldwell v. Trans-Gulf Petroleum Corp., 322 So.2d 171, 174 (La.1975). The relevant language of the LBSL is virtually identical to the language of section 12.[31] Although there are no Louisiana cases discussing "seller" status under the LBSL, in the absence of Louisiana authority, its state Louisiana courts interpret the LBSL in accordance with federal precedents. Ek v. Nationwide Candy Div., Ltd., 403 So.2d 780, 785 (La.App.3d Cir.), writ denied, 407 So.2d 732 (La.1981).[32] Accordingly, the logic of the Supreme Court's Pinter decision is fully applicable to the LBSL.
 
 B. Negligent Misrepresentation; Fraudulent
 
 163
 Misrepresentation.
 
 
 164
 The bondholder plaintiffs assert several Louisiana claims based upon misrepresentation. Each of the misrepresentation claims plaintiffs allege--negligent misrepresentation and fraudulent misrepresentation--requires the plaintiffs to prove reliance.[33] Under Louisiana law, reliance means actual reliance. La Croix v. Recknagel, 230 La. 842, 89 So.2d 363, 367 (La.1956); Luquette v. Floyd, 147 So.2d 894, 899 (La.App.1962), writ denied, 244 La. 119, 150 So.2d 585 (1963).
 
 
 165
 Here, the class has completely failed to prove that most of its individual members actually and subjectively relied upon any misrepresentations. Only Abell and Walton established that they relied upon anything Fryar represented to be true, and neither of these two plaintiffs showed that he relied at all upon WLJ.
 
 
 166
 Moreover, the trial court ruled that any damages awarded under these claims would duplicate damages awarded under rule 10b-5. Since we agree and have held already that Fryar is liable to Abell and Walton for violating rule 10b-5, we defer further discussion of these claims to our discussion of the appropriate damages.
 
 
 167
 C. Legal Malpractice.
 
 
 168
 As we describe above, the law traditionally has allowed only clients or former clients to state malpractice claims against attorneys. Here, we see this principle applied: The bondholders seek to hold WLJ liable to them for malpractice in the work WLJ prepared for the underwriters. Under Louisiana law, the bondholders ordinarily may maintain such an action only where the lawyer prepares an opinion for the benefit of the non-client plaintiff and knows the third party will rely upon that opinion.[34]
 
 
 169
 This test for attorney liability to non-clients was developed first in Capital Bank & Trust Co. v. Core, 343 So.2d 284 (1st La.App.), writ denied, 345 So.2d 61 (La.) and 345 So.2d 504 (La.1977). Core, an attorney, issued Capital a title opinion covering the property described in the collateral mortgage, knowing that Capital would rely thereon in making the loan to Core's client and also knowing the loan would not be made unless his client owned the mortgaged property in full ownership and free of all encumbrances except the collateral mortgage to Capital. Core's title opinion certified his examination of title to a stated date and hour as of which time Core found the mortgaged property was owned by his client free of all encumbrances save the collateral mortgage to Capital. Notwithstanding Core's title opinion, the mortgaged property was burdened with severe defects and encumbrances. Despite Core's knowledge that these statements were false, "he consciously and deliberately certified the truth and accuracy of his opinion." 343 So.2d at 289 (emphasis added).
 
 
 170
 The appellate court held the attorney liable to the bank, reasoning that where an attorney furnishes a title opinion to a non-client knowing the third party would rely upon the opinion, the attorney is liable to the third party. Id. at 288. Significantly, the court grounded its decision in the codal provision that establishes liability for a stipulation pour autrui pursuant to which one may bind himself for the benefit of a third party. In such cases, privity of contract results, and the agreement becomes binding and effective in favor of the third party upon his acceptance. Id; La.Civ.Code art. 1890.
 
 
 171
 Another Louisiana appellate court has held that attorney liability to third parties does not extend beyond the Capital Bank rule. In Clause v. Manuel, 442 So.2d 905 (3d La.App.1983), writ denied, 448 So.2d 106 (La.1984), the court refused to hold a land purchaser's attorney liable to the vendor for a negligent title opinion the attorney prepared. The purchaser bought the property after his attorney issued a title opinion assuring the purchaser (and his financing bank) that the title was clear. Two and one-half years after the transaction, the purchaser discovered a tax lien the vendor had failed to pay. The purchaser sued the vendor, who then brought a third-party complaint against the attorney. The vendor, claiming she would have insisted on a higher price had she known of the encumbrance, sought indemnification from the lawyer.
 
 
 172
 The court affirmed summary judgment on the third-party complaint. It noted that the vendor had never retained the attorney, and that the lawyer did not advise her. As the Clause court wrote, "To render [the attorney] liable ..., we would have to find that his title examination and title opinion were rendered for the benefit of [the vendor]." 442 So.2d at 908.
 
 
 173
 We emphasize that this rule, which we consider eminently sound, does not reduce attorneys' responsibility for their work, but merely prevents attorneys from dividing their loyalties between clients and non-clients. More recent cases reveal that Louisiana courts are concerned acutely about the ethical problems of confidentiality and loyalty that are exposed when the law requires attorneys to reveal information to non-clients.
 
 
 174
 The Louisiana Supreme Court recently ruled that a client does not have a malpractice claim against its own attorney for failing to reveal confidential information unless the client explicitly orders the disclosure. Rayne State Bank & Trust Co. v. Nat. Union Fire Ins. Co., 483 So.2d 987, 992 (La.1986). The importance of preserving client confidences is even more vividly highlighted in Scaccia v. Lowe, 445 So.2d 1324 (La.App. 4 Cir.1984). There, the court refused to hold attorneys for a divorced woman liable to her former husband when they refused to tell him where she had hidden his minor child.
 
 
 175
 These cases underscore how basic attorney-client confidence and loyalty is to the American justice system. To protect those values, Louisiana allows third-party suits only if the attorney prepares an opinion for the non-client on which he knows the non-client will rely. Thus, the attorneys, who are always responsible to their clients and to the bar and the courts for their professional actions, may control when they assume a duty to third parties for their legal opinions.
 
 
 176
 This rule is identical to the one we formulate today to govern the liability of underwriter's counsel to investors who purchase the underwritten securities. We hold that the bondholders have failed to state a malpractice claim against WLJ.
 
 
 177
 D. Fiduciary Duty.
 
 
 178
 The bondholders also assert that WLJ breached a fiduciary duty it owed to them. We cannot find any Louisiana statute or case upon which plaintiffs base their claim, and they refer us to none. We assume, therefore, that their claim is grounded in the general delictual principles of Civil Code articles 2315 and 2316 and of the Restatement (Second) of Torts. In particular, section 552 of the Restatement provides in relevant part:
 
 
 179
 (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
 
 
 180
 We hold that the Restatement provision, assuming it is part of Louisiana law, does not apply here. Bondholders do not suggest any public duty which WLJ has violated. As we have shown, WLJ had no attorney-client relationship with any of the bondholders and did not issue a signed legal opinion to the plaintiffs. Moreover, we cannot find any specific duty to the public which the securities laws impose upon attorneys. "Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose." Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986) (citations omitted). Consequently, WLJ had no fiduciary duty to breach.
 
 
 181
 E. Aiding and Abetting.
 
 
 182
 At the time Westside offered its bonds to the public, Louisiana had a single statute that provided the basis for most vicarious or inchoate liability under Louisiana law. In 1982, that statute, article 2324 of the Louisiana Civil Code, read in relevant part:
 
 
 183
 He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.[35]
 
 
 184
 The bondholders argue that WLJ is liable under this section for having aided Swink (and Fryar) in defrauding the investors who bought up Westside's bond offering.
 
 
 185
 In deciding this issue, as in deciding whether to impose rule 10b-5 liability upon someone who helps another to violate that rule, we focus primarily upon the element of scienter. Article 2324 does not specify the answer to this question, but several cases have analyzed it.
 
 
 186
 Equilease Corp. v. Smith Int'l, Inc., 588 F.2d 919 (5th Cir.1979), is the leading case in our circuit discussing what level of scienter satisfies article 2324. There, a middleman who bought drill pipe for oil and gas exploration and then leased the pipe to oil explorers found itself threatened with bankruptcy. The middleman's primary creditor was the drill pipe manufacturer who had sold it. The middleman conspired with a financing company to defraud one of the financer's clients, a venture capitalist, of funds the middleman desperately needed to remain afloat. To that end, the middleman and financer forged several of the manufacturer's documents, including pipe invoices, to convince the venture capitalist that the middleman owned more assets than he actually did. The venture capitalist, relying upon the forged documents, loaned the middleman the needed funds.
 
 
 187
 At the same time, the manufacturer began pressing the middleman hard to make good on some late payments. Worried that the manufacturer would put it in default, the middleman called the financer, who had possession of the venture capitalist's checks, and ordered the financer to expedite its paperwork. In its rush, the financer sent the manufacturer a suspiciously large check, and accidentally included one of the forged invoices.
 
 
 188
 The manufacturer thought the size of the check peculiar, but did not catch the forgery in the invoice until after it had cashed the check. Once it did catch the forgery, it called the financer, whom the manufacturer thought had originated the new loan to the middleman. (The venture capitalist wished its efforts to remain anonymous, and thus allowed the financer to take all public actions for the venture capitalist.) Naturally, the financer, whose part in the fraud the manufacturer had no reason to suspect, reassured the puzzled manufacturer that all was well. The manufacturer did nothing else, and the venture capitalist did not discover the fraud itself until the bankrupt middleman was no longer able to return the purloined money.
 
 
 189
 In Equilease, the plaintiff venture capitalist argued that the defendant manufacturer, who had no knowledge of the fraud it purportedly had assisted, was liable under a theory of negligence. The venture capitalist suggested two theories to support the proposition that a negligent defendant could be liable for assisting in fraud, which requires knowledge. First, according to the venture capitalist, Louisiana employs a theory of "negligent ignorance" that requires someone who should suspect fraud to investigate and act to thwart the fraud. We agreed with the venture capitalist that
 
 
 190
 [i]n certain situations Louisiana courts have recognized the common law principle, often styling it 'negligent ignorance', that knowledge of the results of a proper investigation can be imputed to a person who has actual knowledge of elemental facts, yet fails to inquire into their significance.
 
 
 191
 Id. at 926.
 
 
 192
 Nonetheless, we reviewed the confused case law of Louisiana and concluded that Louisiana utilizes this tort theory primarily in real property title suits. In such cases, land investors who should have suspected title defects, but failed to investigate, were estopped where the rightful owners sued to regain title. We declined to extend the doctrine of "negligent ignorance" to hold negligent abettors liable for fraud:
 
 
 193
 Knowledge is imputed in these [real property] cases to estop the defendant from taking inequitable advantage of a predicament caused by his own failure to investigate. We are not concerned here with preventing the defendant from obtaining an unfair advantage of his own but with imposing a further obligation on the defendant to compensate the victim of fraud for the loss he sustained. Moreover, the predicament of the plaintiff was not caused by the direct action of the defendant since he was not originally a party to the fraudulent transaction. Rather, the defendant's relationship to the plaintiff arises only from the fact that he may have been able to prevent the predicament had he investigated the possibility that he was assisting a fraud.
 
 
 194
 Id. at 927-28 (footnote omitted).
 
 
 195
 We then turned to the venture capitalist's theory that an abettor, like a joint tortfeasor, may be held liable under Louisiana law for negligently assisting and intentionally inflicting harm. We held:
 
 
 196
 Logically, a party may be held individually liable for negligence whether the damage caused to the plaintiff takes the form of fraud or bodily injury. And we perceive no impediment to binding a defendant who acts negligently in solido with those who commit an intentional tort when the same harm to the plaintiff results, provided, of course, that each party is legally at fault.
 
 
 197
 Id. at 929 (footnotes omitted).
 
 
 198
 The bondholders argue that Equilease applies here. We agree, but hold WLJ not liable. To be "legally at fault," one must owe a duty to the person harmed. In Equilease, we held that the manufacturer had not acted negligently because the manufacturer had no knowledge of the venture capitalist's existence and no concrete evidence of unlawful activity in light of the financer's assurances. We concluded that the manufacturer owed the venture capitalist no further duty to investigate. Similarly, we have already held that WLJ owed no duty to the bondholders to disclose client confidences which WLJ had a duty to keep.[36]
 
 
 199
 We come to the same conclusion when we examine the single relevant Louisiana case decided since Equilease. In Summers Brothers v. Brewer, 420 So.2d 197 (1st La.App.1982), the perpetrator of a fraudulent scheme to raise funds for a non-existent business succeeded because he had forged a maintenance contract and obtained unauthorized stock in another company. Both documents impressed the businessmen he had targeted for the fraud, and convinced them that the non-existent business was real. The maintenance contract was notarized by an attorney who did not witness anyone signing the document, and thus did not know it had been forged. Similarly, the schemer got the "issuing" company's attorney, who knew the perpetrator was a felon, to sign the unauthorized stock certificates.
 
 
 200
 The appellate court held that article 2324 did not impose liability upon either lawyer. The court determined that the attorneys' actions
 
 
 201
 were independent acts, with the fraudulent scheme ... already set in motion before [the lawyers] participated in the fraud. Furthermore, some of the damages caused to plaintiffs by [the attorneys] were not the natural and foreseeable consequences of the earlier fraudulent acts of [the perpetrator], but were rather the result of particular wrongdoing or fault on the part of [the lawyers]....
 
 
 202
 420 So.2d at 204. Thus, where the assistance rendered is comprised of actions that do not involve the abettor directly in the fraud, article 2324 does not apply. This conclusion is reinforced if the assistance itself creates a harm unique and independent from any harm foreseeable from the original fraud.
 
 
 203
 Summers Brothers appears to vitiate Equilease 's teaching that a negligent tortfeasor may be independently liable for another's fraud where the negligence is independent of the fraud and compounds the fraud's harm. However, negligent tortfeasors whose acts are not independent of the fraud still must owe a duty to those whom the fraud harms; otherwise, the fraud victims may not prevail against the negligent actor. Here, WLJ owes no such duty.
 
 
 204
 VI. Damages.
 
 
 205
 Both sides also raise a variety of damages issues touching on virtually every aspect of the lawsuit. We turn now to the damages findings of the jury and the damages awarded by the court.[37]
 
 
 206
 A. Rule 10b-5 Damages.
 
 
 207
 The jury found that the plaintiffs suffered $9,549,000 in lost Westside bond interest payments because of defendants' fraud,[38] but refused to award plaintiffs any out-of-pocket damages. The jury also found that the Cheneyville land transaction, in which All American received $2,000,000 worth of Westside bonds that later entitled it to substantial interest payments, unjustly increased All American's wealth by $2,950,000. The defendants attack this award on two grounds, and the plaintiffs attack it on one ground of their own.
 
 
 208
 First, the defendants argue that the evidence of damages which the plaintiffs presented was too vague and flawed to support any specific damages award. Since we have overturned the judgment in favor of the class as a whole, these damages must be redetermined, in any event.
 
 
 209
 Second, and more fundamentally, the defendants contend that rule 10b-5 plaintiffs may collect only out-of-pocket damages, which the jury found the plaintiffs had not suffered. Defendants also argue that plaintiffs are entitled to only one award under rule 10b-5,[39] and that the award for lost interest should be affirmed only to the extent it exceeds the $2,950,000 windfall profit which All American must repay to the bondholders.
 
 
 210
 Before we consider this challenge, however, we will examine Abell and Walton's response. They counterattack the jury's determination that the plaintiffs suffered no out-of-pocket damages, claiming that the evidence does not support such a verdict.
 
 
 211
 We do not agree with plaintiffs that the jury should have found that the bondholders suffered some out-of-pocket damages. Such out-of-pocket damages, the traditional measure of damages in a rule 10b-5 action, are "the difference between the real value of [the securities at issue] and the amount paid by the plaintiffs at the time of purchase." James v. Meinke, 778 F.2d 200, 205 (5th Cir.1985) (emphasis added). Here, measured at the time of purchase, the jury could find that the bondholders paid only what the bonds were worth. The market price for Westside bonds did not fluctuate much in the first few years after Westside issued them. Even after Westside revealed, in a letter dated January 20, 1983, the information that previously had been withheld, prices for Westside bonds remained stable.
 
 
 212
 Indeed, plaintiffs did not sustain any actual losses until Westside defaulted on an interest payment in October 1984, more than three months after filing this suit. After that default, the bonds temporarily lost much of their face value, but rebounded to about par value after the bankruptcy court allowed Westside to reduce the interest rate which each of the bonds bore. Consequently, few of the Westside bondholders lost any money out of their own pockets, and none who paid the face value of the bonds at any time before October 1984 paid more than the bonds were worth.
 
 
 213
 Defendants aggressively contend that rule 10b-5 awards damages only for out-of-pocket losses. They argue that we adopted this rule in Huddleston. As defendants note, Huddleston observed that "the outof-pocket rule ... is the traditional measure of damages in a rule 10b-5 action...." 640 F.2d at 555. We noted that out-of-pocket losses, properly calculated, measure how much the defendants' fraud inflates the value of the subject securities. The out-of-pocket rule thus distinguishes between losses caused by the defendants' fraud and losses caused otherwise (e.g., by market forces). Id. Consequently, this rule ordinarily is the correct measure of rule 10b-5 damages.
 
 
 214
 "The ultimate question, however, is how much damages did the defendants' fraudulent misstatement or omission cause each individual plaintiff?" Id. at 554. The Supreme Court has approvingly noted that various other measures of damages can be used in section 10b-5 cases where out-of-pocket damages provide an inadequate measure. Randall v. Loftsgaarden, 478 U.S. 647, 663, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). Since Huddleston, we have applied yardsticks other than the out-of-pocket measurement where appropriate. See James v. Meinke (imposing consequential damages where jury found no out-of-pocket damages).
 
 
 215
 In this instance, the plaintiffs argue, the out-of-pocket rule does not accurately measure their losses. Here, the initial value of the possessory interest in the bonds was equal to the par value of those bonds; the bondholders did not suffer any losses until Westside went bankrupt and eventually reorganized. With reorganization, the interest rates which the bonds bore dropped to about two-thirds of the original rates. The decrease in the interest rates naturally reduced the value of the possessory interest from what it would have been otherwise.[40]
 
 
 216
 Since the fraudulently-concealed details of the Westside land transaction and Fryar's shaky guarantee to support Westside financially caused Westside's bankruptcy, the defendants' fraud caused the bondholders to sustain two types of property loss: the loss of a reasonably certain, legally guaranteed stream of income, and the resulting loss of some of the resale value of the bonds. The former is not a loss which the out-of-pocket rule can measure.
 
 
 217
 We agree with bondholders, therefore, that rule 10b-5 may compensate them for the loss of a contracted right to a guaranteed stream of income. The right to receive a specified stream of income is a property right distinguishable from possessory interests in the bonds themselves. The possessory interest allows the purchaser to hold or dispose of the bonds as the purchaser sees fit and entitles the holder to enjoy any subsidiary interests, including the right to receive any income stream which the bond pays, that have not been alienated from the possessory interest itself.
 
 
 218
 The right to receive income-stream payments (or, in the case of bonds, interest payments) is a distinct interest that is subsidiary to the purchaser's possessory interest. As a landowner may sever subordinate mineral rights, so may a bondholder sever the distinct right to income payments (the coupons) from the bond itself.[41] Consequently, an investor purchasing a bond acquires at least two separate property interests vulnerable to the destructive fraud of another.
 
 
 219
 Were we to adopt the defendants' position that only out-of-pocket damages are available, we would effectively limit rule 10b-5 plaintiffs to damages to their possessory interests only--the price paid for the security minus its real value at the time of purchase. Thus, plaintiffs would be unable to collect all the actual damages which the fraud ultimately causes.
 
 
 220
 Here, since the plaintiffs also acquired a right to future interest payments, the damage award must reflect the interest payments plaintiffs lost because of defendants' fraud. Since the fraud, like a cancer, began its destructive course from the time of purchase, we measure the damage to the right to an income stream according to a formula similar to our out-of-pocket damage calculation: Plaintiffs are entitled to the difference, discounted to present value at the time of purchase, between the stream of income as represented and the income stream remaining after the fraud has worked its course.
 
 
 221
 Unfortunately, the expert who calculated and explained to the jury the interest payments which the bondholders had lost discounted the value of those payments to their present value at the time of trial. These calculations, which were the only damages figures upon which the jury could base its verdict, must be recomputed to determine their present value at the time the bonds were purchased. We therefore remand for the district court to recalculate Abell's and Walton's lost interest payments.
 
 
 222
 On remand, we instruct the district court not to recompute how the lost interest payments reduced the bondholders' possessory interest. We measure the damage done to possessory interests by the out-of-pocket rule only. Since the jury found no out-of-pocket damages, the plaintiffs are not entitled to any compensation for lost value.[42]
 
 
 223
 The defendants forcefully urge us to instruct the district court to reduce the rule 10b-5 award by the amount of interest income which the bondholders earned before Westside defaulted on interest payments. The defendants note that the Supreme Court, in Randall, held that rule 10b-5 damage awards ordinarily should reflect the actual damages which the plaintiffs incur. Since the income a bondholder receives from a bond reduces that bondholder's actual damages, income should be deducted from the damage award. The defendants claim that the interest payments here are such income, relying upon cases requiring courts to reduce damages by the dividend income earned on subject securities.
 
 
 224
 We conclude, however, that Randall is inapposite. Here, plaintiffs claim injury to their right to receive specified contractually-set interest payments. They had an established property right to receive an invariable stream of income at specified moments over a pre-determined contractual period.[43] Plaintiffs claimed, and proved, that Fryar, All American, and others fraudulently undermined their rights to future interest payments. It hardly makes sense, in determining what amount of damages will make plaintiffs whole again, to reduce the award by the interest payments which plaintiffs received in the past. Such a result would "make whole" only those plaintiffs who agreed to forsake part of what defendants had not destroyed to regain what defendants had destroyed.
 
 
 225
 Nor do we think that our rule today conflicts with existing law. Randall, for instance, recognized that courts must reduce section 12 damage awards by the income which a section 12 plaintiff receives from owning the subject security. In this case, where we must decide what damages will compensate a rule 10b-5 plaintiff, Randall directs us to determine the "actual damages" which the plaintiff has incurred. Were we considering the damage done to plaintiffs' possessory interest in the bonds, we would have to offset any award by the income which that possessory interest had reaped for its owners. Here, however, the property interest damaged was a right to receive a specific stream of income; offsetting such a damage award by income received under the bond agreements makes little sense.
 
 
 226
 The defendants make one final attack upon the damage award. They argue that if the plaintiffs collect both the $2,950,000 All American must pay for unjust enrichment and all of plaintiffs' lost interest income, the plaintiffs will receive an unjust double recovery. We agree, and direct the district court on remand to award only the lost interest that exceeds what All American must pay for unjust enrichment.
 
 
 227
 Section 28(a) of the Exchange Act limits rule 10b-5 plaintiffs to actual damages. Randall, 478 U.S. at 662. Rule 10b-5 exists primarily to compensate victims and secondarily to deter securities defrauders; as long as the award necessary to compensate victims is enough to deter wrongdoers, we would not award additional deterrent damages. We award such deterrent damages, including damages for unjust enrichment, only when compensatory damages allow the wrongdoers to profit from their fraud. Of course, when we award deterrent damages, they always exceed or equal compensatory damages, and thus it is not necessary to award additional, duplicative "compensatory" damages.
 
 
 228
 Succinctly put, section 28(a)'s actual-damage rule ordinarily requires us to award plaintiffs only what they actually lost. But "where the defendant received more than the [plaintiffs'] actual loss ... damages are the amount of the defendant's profit." Affiliated Ute, 406 U.S. at 155, 92 S.Ct. at 1473. In any event, we never award plaintiffs both their actual loss and the defendant's unjust enrichment, because that would amount to an impermissible double recovery. "[T]he accepted rationale underlying this alternative is simply that '[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.' " Randall, 478 U.S. at 663, 106 S.Ct. at 3153 (emphasis added) (quoting Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965)).
 
 
 229
 B. RICO Damages.
 
 
 230
 1. Sufficiency of the Evidence.
 
 
 231
 Fryar argues that the RICO damages assessed against him and All American (1) should be overturned because Fryar and All American did nothing to harm the bondholders' business and property interests, or, alternatively, (2) should be reduced by one-third, because the compensatory portion of the RICO award duplicates the securities-fraud damages.
 
 
 232
 We reject Fryar's first argument because, as we have already shown, Fryar and All American's securities fraud substantially harmed the plaintiffs' right to future interest payments. As Fryar himself concedes, the plaintiffs base their securities fraud claim upon the same factual allegations as those supporting their mail-fraud RICO claims against Fryar. Since reliance is not an element of the class's RICO claims, it follows that the proof of its damages which the class presented suffices to show that Fryar and All American caused measurable RICO damages against the class members.
 
 
 233
 Fryar contends that the plaintiffs presented only flawed and inadequate evidence to quantify their damages. The crux of Fryar's argument is that the expert testimony which the plaintiffs used to establish damages was based upon faulty assumptions and questionable data. The data consisted of questionnaires, some not completed, which some of the Westside bondholders had answered. The bondholders who returned their questionnaires included people who were not members of the plaintiff class and people who did not buy their bonds from any defendants named in plaintiffs' complaint.
 
 
 234
 Fryar also attacks the expert's calculations based upon this data: Fryar argues that the expert failed to adjust his calculations to account for class members who had sold their bonds, for bondholders who had bought Westside bonds after Westside's bankruptcy, and for the interest income the bondholders earned before Westside went bankrupt. Finally, Fryar argues that the jury verdict does not reduce the plaintiffs' damages to reflect causes other than fraud that contributed to plaintiffs' lost interest income.
 
 
 235
 We reject Fryar's arguments. Albert Derbes, the plaintiffs' damages expert, calculated that the class had lost $8,616,973 in future interest payments discounted to present value at the time of trial.[44] Derbes explained that accounting experts such as himself customarily rely upon questionnaires, similar to the one which Fryar attacks, to compute such lost interest payments. Second, the class does not include persons who purchased Westside bonds after it defaulted on its interest payments, and thus Derbes's calculations (of the class's losses) do not include such bondholders. Neither do we do agree that the jury verdict fails to reduce the award to account for other causes that contributed to plaintiffs' losses. Since the jury awarded plaintiffs considerably less than the damages which they proved at trial, we assume the jury adequately accounted for any additional causes of plaintiffs' damages.
 
 
 236
 2. Duplication of RICO and Securities Damages.
 
 
 237
 The defendants argue that the potential securities fraud award under rule 10b-5 should be reduced by the RICO award against Fryar and All American. They contend that RICO is primarily remedial, and that its treble damages should be considered compensatory relief and thus subject to the single-recovery rule. In defendants' view, we should apply section 28 of the Exchange Act to reduce rule 10b-5 damages to account for the compensation which the plaintiffs obtain under RICO.[45]
 
 
 238
 We are not directed, however, to any of our cases that address the nature of RICO in this regard. After conducting our own search of applicable authorities, we have concluded that none of our sister circuits has considered this question either. We acknowledge that several district courts have expounded learnedly on how to characterize RICO damages,[46] but there are no extant opinions that bind us today. We write, therefore, on an essentially clean slate.
 
 
 239
 At least a portion of the RICO damages should be deemed remedial. Civil damages under RICO are available only to those persons "injured in [their] business or property by reason of a [RICO] violation...." 18 U.S.C. Sec. 1964(c). Congress directed the courts that RICO as a whole "shall be liberally construed to effectuate its remedial purposes." 84 Stat. 947, 18 U.S.C. Sec. 1961 note.
 
 
 240
 Here, whatever portion of RICO relief is remedial duplicates the damages awarded under rule 10b-5. The evidence fails to show that the defendants caused any harm to plaintiffs' business or property other than to reduce their interest income from Westside bonds. As we have already discussed, the individual plaintiffs are entitled to recover from All American all the unjust enrichment which All American gained from Westside. Thus, we must adjust Abell's and Walton's damage claims. Since All American's gains (valued by the jury at $2,950,000) exceed the RICO damages ($2,550,000), the only question is: How much of the RICO award is compensatory and thus duplicative of rule 10b-5 relief?
 
 
 241
 The answer to this question turns on the nature of treble damages under RICO. Congress provided, in 18 U.S.C. Sec. 1964(c), that RICO plaintiffs are entitled to treble proven damages and a reasonable attorneys' fee. We must determine whether the trebling feature of section 1964(c) damages is penal or remedial. If remedial, treble damages are entirely compensatory, and the rule 10b-5 award must be reduced by the entire amount of the RICO award attributable to Abell and Walton. If RICO's trebling formula is penal, then only one-third of the RICO damages are compensatory, and the securities fraud damages are to be reduced by one-third of Abell's and Walton's RICO recoveries.
 
 
 242
 Courts faced with the task of determining whether a statute is penal in nature need not venture upon uncharted seas, for the standard of analysis has been defined since the case of Huntington v. Attrill, 146 U.S. 657, 668-69, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892):
 
 
 243
 The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual, according to the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs. The former are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals; and are thereupon frequently termed civil injuries: the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community; and are distinguished by the harsher appellation of crimes and misdemeanors.' [Emphasis in original.]
 
 
 244
 On the basis of the Supreme Court's opinion and its progeny, the Sixth Circuit in Murphy v. Household Fin. Corp., 560 F.2d 206, 209 (6th Cir.1977), distilled three factors to be used in determining whether the statute is penal: (1) whether the purpose of the statute is to redress individual wrongs or more general wrongs to the public; (2) whether the recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.
 
 
 245
 We have never adopted the Sixth Circuit test, but have instead accepted it as a useful tool in interpreting Huntington. Cf. First Nat'l Bank & Trust Co. v. Flatau, 643 F.2d 188, 191 (5th Cir.1980). In that vein, we note the following passage from Huntington:
 
 
 246
 In the municipal law of England and America, the words 'penal' and 'penalty' have been used in various senses. Strictly and primarily, they denote punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws. [Citations omitted.] But they are also commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered.
 
 
 247
 146 U.S. at 666-67, 13 S.Ct. at 227 (emphasis added) (as quoted in First Nat'l Bank & Trust Co. v. Flatau, 643 F.2d at 190).
 
 
 248
 We hold that the portion of RICO damages in excess of actual damages is penal. Those added damages are "not limited to the damages suffered"; they seem more designed to deter than to compensate. As Congress constructed them, the civil provisions of RICO compensate primarily victims of fraud or fraudulent schemes. Had Congress merely wanted to make whole this new class of plaintiffs, it would have limited civil RICO damages to the actual damages commonly available to fraud victims.
 
 
 249
 However, in promulgating RICO, Congress expressly found that the problem of racketeering was primarily public, not private, including draining resources from the economy, subverting the democratic process, and undermining the general welfare. 84 Stat. 922-23 (1970) (findings and purpose of the Organized Crime Control Act of 1970, Title IX of which is RICO). See also Summers, 592 F.Supp. at 1242. We conclude, therefore, that Congress trebled RICO damages as part of this overall attack on the public wrongs of organized crime.[47]C. Attorneys' Fees.
 
 
 250
 The district court, after an extensive hearing, awarded $2,567,323.30 in attorneys' fees. In spite of the "American rule" that attorneys' fees shall be awarded as a matter of course only when a specific statute so authorizes, the court failed to indicate the basis for its decision. The defendants challenge this award.
 
 
 251
 WLJ contends that it is not substantively liable for violating any statute upon which the court may have based attorneys' fees. Since we have absolved WLJ of all liability, we agree and reverse the district court's judgment insofar as it holds WLJ and its insurer (Valley Forge) liable for attorneys' fees.
 
 
 252
 Fryar also argues that the district court should have assessed only those attorneys' fees necessary to develop the claims for which attorneys' fees may be awarded. He notes, correctly, that attorneys' fees are not available as a matter of course under rule 10b-5. Huddleston, 640 F.2d at 559. Fryar argues that work done on the securities claims, under which plaintiffs may not receive attorneys' fees, undoubtedly consumed most of the legal resources which the plaintiffs spent on this case. Consequently, Fryar's position, should we adopt it as our own, would dramatically reduce the attorneys' fees to which plaintiffs are entitled.
 
 
 253
 We note first that Fryar's argument presents a case of first impression. Of the statutes upon which the plaintiffs based their claims, only RICO and the Louisiana fraud statutes allow a court to award attorneys' fees as a matter of right. We have not been directed to any cases interpreting these statutes in regard to the attorneys' fees issue presented here.
 
 
 254
 We choose to adhere to a rule slightly different from the one which Fryar proposes. We think it best to apply the rule we have fashioned for awarding attorneys' fees in other areas of the law. Where plaintiffs base several claims, derived "from related legal theories," upon "a common core of facts," we allow attorneys' fees for the work done on all such related claims. Hernandez v. Hill Country Telephone Coop., Inc., 849 F.2d 139, 144 (5th Cir.1988) (citing Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)); Espino v. Besteiro, 708 F.2d 1002, 1007-10 (5th Cir.1983). As Fryar himself concedes, the RICO claims arise "from the matrix of" plaintiffs' securities claims. All of the state-law claims which plaintiffs assert against Fryar also arise from the same transactions that underlie plaintiffs' RICO and securities claims against Fryar.
 
 
 255
 Nonetheless, we cannot simply affirm the district court's award, for that court awarded attorneys' fees against all of the defendants who stood trial. Thus, the court awarded attorneys' fees for all of the legal work necessary to develop and try plaintiffs' case. Plaintiffs developed much of their case, however, to obtain a verdict against WLJ. Several of plaintiffs' legal theories and arguments applied only to WLJ; indeed, at least one of their claims (for legal malpractice) implicates only WLJ. Consequently, the district court must readjust the attorneys' fees award to compensate plaintiffs only for the legal resources which they expended to develop a case against Fryar and All American. For this purpose, we will remand.
 
 
 256
 D. Judicial Interest.
 
 
 257
 To all of these awards, the district court added twelve percent per annum judicial interest calculated from the date of judicial demand. The defendants claim that they should not have to pay this interest, totaling about $1,000,000, on these awards because they are already paying damages equal to the interest rate which the bonds bear. The plaintiffs counter that the district court properly imposed judicial interest upon the lost interest damages, since the district court awarded lost interest to the plaintiff class to compensate plaintiffs for the loss of the use of money that rightfully belonged to them.
 
 
 258
 The plaintiffs are correct. We add that the lost interest payments, which would have been due on virtually all the bonds until at least 1998, have already been discounted to present value. These damages do not represent the face value of the interest payments as they would have continued to come due, but the resale value, at a specific point in the past, of the right to receive those payments in the future. Consequently, the damages awarded for lost interest reflect losses which the plaintiffs have already sustained, not losses they will sustain in the future. The district court properly applied judicial interest.
 
 
 259
 VII. Valley Forge's Appeal.
 
 
 260
 Valley Forge, WLJ's malpractice insurer, has also appealed this case on a coverage question. The court tried Valley Forge along with All American, Fryar, and WLJ, and after trial adjudged Valley Forge liable in solido for all the awards against WLJ. Those awards exposed Valley Forge to potential liability exceeding $9,000,000. Valley Forge argues on appeal that WLJ's policy limits are $5,000,000, not the $10,000,000 the district court found.
 
 
 261
 We do not reach this argument. We merely note that Valley Forge is liable only to the extent WLJ is. Since we have reversed every basis for imposing liability upon WLJ, we now vacate the district court's judgment to the extent it imposes liability upon Valley Forge, and we dismiss Valley Forge's appeal.
 
 
 262
 VIII. Jury Tampering.
 
 
 263
 To summarize what we have held thus far: WLJ and Valley Forge are not liable under any legal theories of this case. Fryar, as a matter of law, is not liable under section 12 of the Securities Act or the LBSL, or to the plaintiff class for violating rule 10b-5 or any other state-law claims based upon misrepresentation. The evidence sufficiently supports Abell's and Walton's individual rule 10b-5 and state-law misrepresentation claims against Fryar, but the damages for those claims must be recalculated, because damages were determined for the entire class and not just Abell and Walton. Sufficient evidence also supports the jury verdict holding Fryar liable to the class for violating RICO, but the damage award must be reduced by one-third to avoid double recovery. Sufficient evidence, moreover, supports all of the damage awards. Finally, the district court properly awarded attorneys' fees against Fryar and All American but improperly against WLJ and Valley Forge.
 
 
 264
 We review all these holdings at this stage in the opinion to remind the reader which are issues of law and which ones are based merely upon the sufficiency of the evidence. The importance of that distinction will soon become apparent, as we now turn to allegations that Fryar prejudiced the jury against himself by trying to bribe one of its members.
 
 
 265
 A. The Relevant Procedural Facts.
 
 
 266
 A little over a month into the trial, the judge received information from the FBI that Fryar was attempting to bribe several members of the jury. The FBI continued to investigate this allegation, but it had probable cause to believe that Fryar had targeted and contacted jurors Terracina and Teer. The judge questioned an FBI agent extensively in camera, outside the presence of the defendants and their attorneys, and satisfied itself that probable cause existed to believe that Fryar indeed had attempted to bribe Terracina and Teer.
 
 
 267
 The judge sealed the record of this in camera hearing, and kept the information to himself until the last day of trial. On that day, he called the attorneys into his chambers, informed them that he had probable cause to believe that someone was tampering with jurors Terracina and Teer, and told them that he would excuse those jurors without giving any specific explanations to the jury. In open court, the judge excused Terracina and Teer from the jury, reducing the size of the jury to the six jurors who would deliberate the case.
 
 
 268
 After several hours of deliberation, the jury returned its verdict against the defendants. Immediately afterwards, the trial judge examined each of the jurors individually, outside the presence of the other jurors but in the presence of all the attorneys. Each of the jurors claimed to have heard nothing about the bribery attempt, and each swore that nothing had affected his or her decision. After this voir dire, the judge released the jurors to the custody of the FBI and the marshals so that these law enforcement authorities could continue their jury-tampering investigation.
 
 
 269
 In the course of this police investigation, the FBI determined that most of the jurors actually knew about Fryar's attempt to bribe Terracina. When the court found out that the jurors had lied about their knowledge of Fryar's bribery attempts, it conducted a second voir dire, also in the presence of the attorneys.
 
 
 270
 In this second voir dire, the court determined that the jurors had decided collectively not to admit their knowledge of the bribery attempts. Each juror testified the second time that he or she had lied the first time because he or she did not consider the bribery stories that Terracina told to be the truth, and each juror wanted to avoid even the possibility of a mistrial, because the jurors did not want their efforts to go for naught.
 
 
 271
 Terracina was viewed universally by his co-jurors as an unstable, unpredictable individual. Consequently, none of the jurors believed Terracina when he informed them that Fryar had offered him $10,000 to vote for Fryar. Some of the jurors discussed Terracina's story among themselves, and came to the same conclusion.
 
 
 272
 None of the jurors, however, had heard anything about any attempts to bribe Teer, a much more respected member of the panel. The jurors testified that they had been disappointed, and somewhat surprised, when the judge excused Terracina and Teer.
 
 
 273
 Most of the jurors testified that they had assumed that the last two jurors chosen were alternates and would be the ones to be excused at the end of the trial. Since neither Terracina nor Teer was among the last two jurors chosen, several of the jurors immediately began to speculate as to why those jurors had been excused. A few admitted that they began to wonder whether there was any truth to the stories which Terracina had been telling them. Indeed, it was shortly after Terracina and Teer were excused that the jurors discussed what to do if asked about Terracina's story, and it was then that the jurors decided that they would lie.
 
 
 274
 Nonetheless, each of the jurors continued to insist that he or she still did not believe Terracina's story. Moreover, each juror insisted that what he or she knew about Fryar's attempts to bribe Terracina had nothing to do with his or her own personal decisions in deliberating the case.
 
 
 275
 The trial judge chose to believe the jurors' testimony that they had not been prejudiced. Additionally, the trial judge noted that he considered the verdict to be an imminently fair and reasonable one that showed no signs of prejudice. Nevertheless, Fryar asks us to grant him a new trial.
 
 
 276
 B. The Law.
 
 
 277
 The Constitution, through the due process clause of the fifth amendment and the right to jury trial enshrined in the sixth and seventh amendments, requires federal courts to give every defendant a fair trial. Haley v. Blue Ridge Transfer Co., 802 F.2d 1532 (4th Cir.1986). It has been written in even the most ancient authorities that the Constitution guards against even the appearance that prejudice has infected a jury. See Budoff v. Holiday Inns, Inc., 732 F.2d 1523 (6th Cir.1984) (describing nineteenth-century cases).
 
 
 278
 Until recently, courts generally agreed that any extra-judicial contact or material reaching the jury presumptively prejudices it. See Haley; United States v. Butler, 822 F.2d 1191 (D.C.Cir.1987). Under Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the party supporting the jury's verdict carried a heavy burden to disprove jury prejudice.[48] See Haley; Butler; United States v. Forrest, 620 F.2d 446 (5th Cir.1980). However, the Supreme Court cast a forboding shadow on these assumptions when it decided Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).
 
 
 279
 There, the Court reversed the Second Circuit's judgment granting a writ of habeas corpus to a New York inmate convicted of murder. Shortly after the state murder trial began, one of the jurors applied to the prosecutor's office for a job in a newly-formed investigative department. The prosecutor himself did not know about the juror's job application until several days into the trial, and thought it too insignificant to tell the judge when he did find out. When the trial judge was informed, he held a hearing to determine whether the juror's contact with the prosecutor's office had biased the juror against the defendant. After hearing testimony from the prosecutor and Smith, the trial judge found " 'no evidence' suggesting [the juror bore] 'a sinister or dishonest motive' "[49] or had been prejudiced.
 
 
 280
 The defendant, now convicted, eventually petitioned the district court for a writ of habeas corpus. The court granted the writ. 485 F.Supp. 1365 (S.D.N.Y.), aff'd, 632 F.2d 1019 (2d Cir.1980). Both the district court and the court of appeals held that the trial court should have conclusively presumed prejudice from the facts. 455 U.S. at 214, 102 S.Ct. at 944.
 
 
 281
 The Supreme Court reversed, holding that due process requires only that the trial court hold a Remmer hearing to determine whether the juror has been prejudiced. Citing Remmer, the court wrote,
 
 
 282
 This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.
 
 
 283
 Id. at 215, 102 S.Ct. at 945. Later, the Court added that
 
 
 284
 ... due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.
 
 
 285
 Id. at 217, 102 S.Ct. at 946 (footnote omitted).
 
 
 286
 The bondholders argue that Smith v. Phillips overruled Remmer's heavy presumption of juror prejudice. According to the bondholders, Smith v. Phillips requires the party challenging the jury verdict to prove prejudice. Defendants respond that Smith v. Phillips is distinguishable, primarily because it was a habeas challenge to a state trial, not a direct appeal.
 
 
 287
 Several of our sister circuits already have considered this question squarely. In United States v. Pennell, 737 F.2d 521 (6th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), the court concluded that the Remmer presumption had been overruled. There, five jurors received anonymous, early-morning calls instructing them to convict a criminal defendant. The Sixth Circuit refused to order a new trial because the district judge had held a hearing and determined that the defendant had not proved prejudice.
 
 
 288
 Pennell, however, has not been accepted in any other circuit, and three circuits have explicitly rejected the argument that the challenging party must prove prejudice.[50] Other cases, while not facing the question directly, have continued to apply the Remmer presumption despite Smith v. Phillips.[51] We have applied the Remmer presumption since Smith v. Phillips; however, we have not yet explicitly determined how Smith v. Phillips has affected Remmer. See United States v. Webster, 750 F.2d 307, 336-39 (5th Cir.1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 856 (1985). Webster does not explicitly take account of Smith v. Phillips. Moreover, it specifies that where outside influence on the jury is alleged, "a presumption of prejudice arises," and it is incumbent upon the government to rebut that presumption at a hearing. 750 F.2d at 338.
 
 
 289
 We do not find this dictum in Webster to be controlling here. It is not evident that the panel was cognizant of the new standard, suggested in Smith v. Phillips, that no longer assumes jury prejudice. Further, Webster noted that "we do not find it necessary to decide if a presumption of prejudice should be applied in all cases of this nature." Id. at 339.
 
 
 290
 More importantly, and irrespective of the question of who must carry the burden, it is evident here that the trial court properly conducted a hearing, with jurors, that satisfies the requirements of both Smith v. Phillips and Webster. Smith v. Phillips requires a "hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. at 215, 102 S.Ct. at 945. Quoting Remmer, 347 U.S. at 230, 74 S.Ct. at 451, the Court noted that at the hearing, the trial judge should " 'determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate.' " 455 U.S. at 216, 102 S.Ct. at 945 (emphasis added in Smith v. Phillips ). In Webster, the panel noted specifically that "[c]ounsel should be present at any hearing held to assess outside influence on the jury." 750 F.2d at 338 (citing United States v. Forrest, 620 F.2d 446 (5th Cir.1980)).
 
 
 291
 In the case which we now review, the district judge amply met these requirements, examining the jurors[52] separately in two special post-verdict hearings at which all counsel were present. After carefully considering all of the facts available to him, and examining the demeanor of the jurors during questioning, he concluded that no prejudice had been established.
 
 
 292
 It is appropriate here that we respect that determination by the fact-finder. The panel in Webster emphasized the extensive deference that should be accorded the trial judge in assessing juror bias. As in Webster, we "think the trial court did an admirable job of evaluating the extent of prejudice without contributing to the problem by over emphasis. Moreover, we agree with the trial court that the interviews reveal that the jury was still capable of impartiality." Id. at 339. In other words, the trial court had the right to believe the jurors' unanimous testimony that bribery did not affect their verdict.
 
 
 293
 Even if we were not convinced that the district court correctly found an absence of jury prejudice here, we would not permit the perpetrator of jury tampering, in a civil proceeding, to reap the rewards of his misdeed by enjoying a new trial.[53] "Our system of justice has not delegated to every reprobate the power to effect a mistrial." United States v. Williams, 737 F.2d 594, 612 (7th Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). See also Butler, 822 F.2d at 1196 n. 2 (quoting Williams ).
 
 
 294
 We are mindful that in Forrest, a criminal case, we held that the defendant should receive a new trial even though he had tampered with the jury that convicted him. See 620 F.2d at 458-59. However, in Forrest we did not specifically extend the holding to civil proceedings and see no reason to do so now. The liberty interests inherent in a criminal proceeding provide justification for a different result there.
 
 
 295
 Moreover, equity plays such a central role in our civil jurisprudence that we are loathe to permit civil litigants to view jury tampering as a "heads I win, tails you lose" proposition whereby a party who tampers with the jury might win if he is not caught, and receive a new trial if he is. Accordingly, we hold that Fryar is not entitled to a new trial.
 
 
 296
 IX. Conclusion.
 
 
 297
 We REVERSE the judgment against WLJ and Valley Forge. We also DISMISS Valley Forge's appeal as moot to the extent that the appeal challenges the judgment concerning the coverage limits of WLJ's policy.
 
 
 298
 We REVERSE the district court's judgment against Fryar to the extent it is based upon section 12 of the Securities Act or the LBSL. We also REVERSE the court's judgment awarding damages to the class against Fryar for violating rule 10b-5, and for violating Louisiana law. We AFFIRM the district court's judgment concerning liability upon the RICO claims against Fryar, and Abell's and Walton's rule 10b-5 claims and non-securities state-law claims against Fryar. Consequently, we also REVERSE and REMAND the attorneys' fees award against Fryar for redetermination in light of our holdings regarding the liability and non-liability of the various defendants.
 
 
 299
 We REVERSE and REMAND the damage awards, for redetermination in accordance with the discussion of damages in this opinion. In addition to the ultimate damage award, the court may also award any appropriate judicial interest.
 
 
 300
 The judgment is AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 [1]
 We recite the facts of this case in the light most favorable to the jury's verdict
 
 
 [2]
 Medical facilities that receive Medicaid reimbursements must have a certificate of need. Since Westside was designed to rely upon Medicaid as its only source of funding, Westside's existence depended upon Fryar's ability to obtain that certificate
 
 
 [3]
 David Menz, the WLJ partner who represented the underwriters, testified that he thought the Booz, Allen feasibility report was irrelevant because the subsequent Booz, Allen letter seemed to suggest that the change in targeted clientele made the old report obsolete
 
 
 [4]
 The bond indebtedness was restructured in bankruptcy so as to reduce the interest rates of the bonds as follows:
 Original Restructured
 Rate Rate
-------- ------------
 16.50% 10.50%
 16.25% 10.15%
 16.00% 10.30%
 14.00% 8.85%
 
 
 [5]
 Additionally, bondholders sued Skye; Swink; Hancock; Hancock, Joseph & Daniels; Peck; Peck, Shaffer & Williams; Westside's president; and several of the companies that insured them. All of these defendants settled with the bondholders before trial
 
 
 [6]
 Section 12 reads in its entirety:
 Any person who--
 (1) offers or sells a security in violation of section 77e of this title, or
 (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 [7]
 Section 5 of the Securities Act, 15 U.S.C. Sec. 77e, prohibits the sale of unregistered securities not exempted under section 3 of the Securities Act, 15 U.S.C. Sec. 77c
 
 
 [8]
 Like automobile manufacturers, issuers create distribution chains composed of independent businesses aligned for a single purpose: to sell the product. Just as Ford and General Motors never sell directly to consumers, many issuers never sell their securities directly to investors. Nonetheless, automobile manufacturers engage in intensive marketing campaigns to convince the public to buy their products from dealerships readily identified with the manufacturer. Consequently, one often hears that someone "has bought a new car from Ford." To the extent that issuers and underwriters use an analogous system to distribute securities, they too may be sellers from whom one buys products
 
 
 [9]
 We previously had defined a "seller" as
 (1) one who parts with title to securities in exchange for consideration or (2) one whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.
 Dahl v. Pinter, 787 F.2d 985, 990 (5th Cir.1986), vacated, --- U.S. ----, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (citing our prior cases), on remand, 857 F.2d 262 (5th Cir.1988).
 
 
 [10]
 Section 10(b) plaintiffs must also prove that the defendants committed the alleged fraud "in connection with a purchase or sale of securities," but that element is not in doubt here
 Section 10(b) reads, in relevant part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-- ...
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b-5 reads:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1987)
 
 
 [11]
 That letter, designed to calm investors' fears, disclosed the $2.4-million profit Fryar and All American collectively had made from selling land to Westside. It also revealed that Fryar used the money generated from this land transaction, not money originally his own, to secure his personal bonds backing the project. Finally, the letter reported the negative assessment which Booz, Allen had made of Fryar's 1983 Westside plans
 
 
 [12]
 Westside's reorganization plan significantly lowered the interest rate borne by Westside bonds
 
 
 [13]
 We express no opinion regarding any other of Abell's theories of this case (e.g., that the Booz, Allen study revealed otherwise-undisclosed facts that contributed to Westside's bankruptcy). Our task is not to justify the jury verdict, but to ascertain whether the evidence sufficiently supported at least one view of the facts to permit a verdict for the plaintiffs
 
 
 [14]
 To state a claim under rule 10b-5, a plaintiff must allege either that the defendant misrepresented material facts or omitted material facts which a pre-existing duty required it to disclose to the plaintiff. We have held that claims based upon misrepresentations sound in part 2 of rule 10b-5, whereas claims based upon omissions are founded upon parts 1 and 3 of the rule. See, e.g., Finkel v. Docutel/Olivetti Corp., 817 F.2d 356, 359-60 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). See supra n. 10 for the text of rule 10b-5
 
 
 [15]
 To define more vividly the distinction between misrepresentations and omissions, we suggest the following hypothetical: Suppose a car owner, wishing to sell her vehicle, advertises in the newspaper that her car has a "new" battery when she knows the battery is five years old. She has communicated an outright lie, and the basis of a fraud against her is falsehood (a category of misrepresentation). If a prospective buyer asks her, "How is the engine?", she might reply, "I've never had a problem with it." If, however, she has owned the car for only a few weeks, and knows that the previous owner had the engine rebuilt two months ago, she has distorted the truth by telling only part of it--another form of misrepresentation. Finally, assume the owner has decided to sell her automobile because a mechanic she knows considers the vehicle "not safe at any speed." Nonetheless, she tells this only to potential buyers who specifically ask her why she is selling the car. In this last case, the owner has omitted saying anything about a particular material matter
 
 
 [16]
 The plaintiffs in Basic were former stockholders in a company that falsely denied the existence of merger talks. The plaintiffs sold their stock before the merger negotiations drove up stock prices
 
 
 [17]
 WLJ does not argue that, at most, only Fryar committed fraud. Since WLJ does not challenge the jury's finding that the underwriters participated in the fraud, we accept the jury's verdict
 
 
 [18]
 See, e.g., First Mun. Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart, 648 S.W.2d 410, 413 (Tex.App. 5 Dist.1983, writ ref'd n.r.e.) (refusing to extend attorney malpractice claims to third parties not in privity with the defendant lawyer); Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986) ("[L]awyers ... are [not] required to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose" (citations omitted).); Goodman v. Kennedy, 18 Cal.3d 335, 134 Cal.Rptr. 375, 556 P.2d 737, 743 (Cal.1976) (if attorneys were liable to both clients and other parties to arms-length transactions, attorneys would become self-protective and could not fulfill counseling role)
 
 
 [19]
 See Barker; Page v. Frazier, 388 Mass. 55, 445 N.E.2d 148, 153 (1983) (absent separate attorney-client relationship, lawyer owes no duty of reasonable care to adverse party because of attorney's conflicting duty to client); Bush v. Rewald, 619 F.Supp. 585 (D.Haw.1985) (lawyer owed no duty to investors buying from organization where organization, not investors, was attorney's client)
 
 
 [20]
 This rule, which a growing number of states have adopted for imposing liability for negligently-rendered opinions, reflects the increasing influence of Restatement (Second) of Torts Sec. 552 (1977). That section provides:
 Information Negligently Supplied for the Guidance of Others
 (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
 (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
 Section 552, however, has not affected legal malpractice law as much as that provision has impacted other areas of malpractice law. A majority of states still require privity between legal malpractice plaintiffs and defendants. See generally Annotation, What Constitutes Negligence Sufficient To Render Attorney Liable to Person Other than Immediate Client, 61 A.L.R. 4th 464 (1988); Annotation, Attorney's Liability, to One Other than Immediate Client, for Negligence in Connection with Legal Duties, 61 A.L.R. 4th 615 (1988). See also First Mun. Leasing Corp., 648 S.W.2d at 413.
 
 
 [21]
 The bondholders cite numerous other cases to support their position, but most are easily distinguishable. Several impose liability upon lawyers who issued opinion letters. E.g., Morgan v. Prudential Group, Inc., 527 F.Supp. 957 (S.D.N.Y.1981), aff'd, 729 F.2d 1443 (2d Cir.1983). Others involve lawyers who stepped out of their professional legal roles and actively promoted the securities (e.g., S.E.C. v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1095 (2d Cir.1972)), or attorneys who were sued by their own clients (e.g., DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 190 (9th Cir.1987)). The remaining cases are district court cases with little precedential weight here
 
 
 [22]
 We have failed also to find any authority requiring us to follow the general rule here. WLJ cites us to Dirks v. S.E.C., 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), and Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), but we find these cases inapposite here. Both Chiarella and Dirks analyzed cases in which the S.E.C. charged the defendants with having breached a specialized, pre-existing duty to disclose certain facts. In these cases, the S.E.C.'s claims rested upon whether the defendants had a duty to speak when they preferred to remain completely silent. Here, by contrast, the plaintiffs have alleged that WLJ, by its actions, adopted the false statements and distortions made by its clients. The claimed duty here, then, is not a duty to speak rather than remain silent, but a duty to correct false statements and distortions rather than acquiesce in them
 
 
 [23]
 The federal criminal aiding and abetting statute requires that the alleged abettor share in the criminal intent of the principal and engage in affirmative conduct designed to aid the venture. United States v. Ortiz-Loya, 777 F.2d 973, 980 (5th Cir.1985). Accord, United States v. Weddell, 800 F.2d 1404, 1408 (5th Cir.), modified, 804 F.2d 1343 (5th Cir.1986). "Thus, to sustain a conviction, the evidence and reasonable inferences therefrom must show [the defendant] knew that a fraud was occurring, that he associated himself with that fraud, that he participated in it with a desire that it be accomplished, and that he committed some overt act designed to make it a success." United States v. Westbo, 746 F.2d 1022, 1025 (5th Cir.1984)
 
 
 [24]
 We re-emphasize that WLJ's duty ran to its clients, not to the bondholders
 
 
 [25]
 We note that this analysis is the same whether we characterize "clear proof of intent" as the proof necessary to show knowledge or as the evidence necessary to establish commitment
 
 
 [26]
 18 U.S.C. Secs. 1961-1968. The portions of RICO that are relevant to this appeal are:
 Sec. 1961. Definitions
 As used in [RICO]--
 (1) "racketeering activity" means
 ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... or (D) any offense involving ... fraud in the sale of securities....
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.
 Sec. 1962. Prohibited activities
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 Sec. 1964. Civil remedies ...
 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 
 
 [27]
 The court was required under 18 U.S.C. Sec. 1964(c) to treble the bondholders' damages. See supra n. 26
 
 
 [28]
 We recently granted a petition for a rehearing en banc to address this issue. Smith v. Cooper/T. Smith Corp., 850 F.2d 1086 (5th Cir.1988) (vacating panel op. at 846 F.2d 325 (5th Cir.1988))
 
 
 [29]
 See also United States v. Toney, 605 F.2d 200, 205 (5th Cir.1979), cert. denied, 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 779 (1980); United States v. Netterville, 553 F.2d 903, 909 (5th Cir.1977), cert. denied, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977) and 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978)
 
 
 [30]
 We have stated that a person "need only have had a reasonable basis to foresee that his actions would result in the use of the mails" to be convicted of mail fraud. United States v. Georgalis, 631 F.2d 1199, 1206 (5th Cir. Unit B 1980). Here, Fryar had a reasonable basis to foresee that the underwriters and brokers would use the mails to sell the bonds and reassure the investors once the bonds were sold
 
 
 [31]
 The relevant language of the LBSL, as it existed throughout the period relevant to this appeal, reads:
 Sec. 715 [of Title 51]. Civil liabilities
 A. Any person who ... offers or sells a security in violation of [the LBSL] ... is liable to the person buying the security from him....
 B. Every person who directly or indirectly controls a seller liable under Subsection (A), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller....
 Neither WLJ nor Fryar was a controlling person, a broker-dealer, agent selling the bonds, or a partner, officer, or director of any organization that might be considered a "seller." Thus, Sec. 715(B) does not apply to this case.
 
 
 [32]
 Cf. Landry v. All Am. Assur. Co., 688 F.2d 381 (5th Cir.1982) (applying federal tolling doctrine to LBSL in the absence of contrary Louisiana authority); Huddleston v. Herman & MacLean, 640 F.2d 534, 551 & n. 27 (5th Cir. Unit A 1981), rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (applying federal case law defining "seller" under the federal Securities Act to Texas blue sky statute in the absence of contrary Texas authority). Both the plaintiffs and WLJ have stated in briefs that the determination of "seller" status under the LBSL should be the same as the determination of "seller" status under Sec. 12
 
 
 [33]
 Negligent misrepresentation, according to Louisiana jurisprudence, is encompassed within the broad language of articles 2315 and 2316 of the Louisiana Civil Code. Devore v. Hobart Mfg. Co., 367 So.2d 836, 839 (La.1979). To prevail on a claim of negligent misrepresentation, the plaintiff must show that the defendant owed a legal duty to him to provide correct information, a breach of that duty, and resultant injury to the plaintiff. Beal v. Lomas & Nettleton Co., 410 So.2d 318, 321 (La.App. 4th Cir.1982); Josephs v. Austin, 420 So.2d 1181, 1185 (La.App. 5th Cir.1982), writ denied, 427 So.2d 870 (La.1983). In analyzing claims of negligent misrepresentation, Louisiana courts have referred to the Restatement (Second) of Torts. Dousson v. South Cent. Bell, 429 So.2d 466, 468 (La.App. 4th Cir.), writ not considered, 437 So.2d 1135 (La.1983). See also Silver v. Nelson, 610 F.Supp. 505, 521 (E.D.La.1985)
 Specifically, Louisiana courts have adopted the definition of negligent misrepresentation set forth in the Restatement (Second) of Torts Sec. 552, which states,
 (1) One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. [Emphasis added.]
 In general, the elements of a claim of fraudulent misrepresentation or fraud may be stated as follows: (1) a misrepresentation of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury. See La.Civ.Code arts. 1847, 2315; see also Silver v. Nelson.
 
 
 [34]
 Non-clients may also sue attorneys, who are the agents of their clients, for actions that exceed the scope of authority given by the clients. Sondes v. Sears, Roebuck & Co., 501 So.2d 829 (4th La.App.1986). Such actions follow the law regarding third-party complaints against agents who exceed their authority. Since the bondholders do not allege that WLJ overstepped its bounds as an agent for the underwriters, we need not consider such a complaint here
 
 
 [35]
 Louisiana has since amended article 2324 (in 1987), and it no longer contains this language
 
 
 [36]
 Bank of New Orleans & Trust Company v. Monco Agency, Inc., 823 F.2d 888 (5th Cir. 1987), cert. denied, --- U.S. ---, 108 S. Ct. 1019, 98 L.Ed. 2d 984 (1988), is inapposite because that case only reversed a summary judgment in favor of accountants which had held a bank's claim to be time barred. The issue of accountants' duties to nonclient third parties (such as the bank) was not raised or decided by that appeal
 Bank of New Orleans is inapplicable here because an independent audit, which admittedly was not prepared specifically for the bank, nonetheless is a public document that represents the opinion of the accountant to the public at large. Moreover, public accountants traditionally have greater duties to the public, and correspondingly fewer duties to their clients (and many fewer rights to claim privilege), than do attorneys.
 
 
 [37]
 Since we decide all liability issues favorably to WLJ, the damage issues apply only to Fryar. Of course, certain of the arguments as to damages were presented by WLJ
 
 
 [38]
 Since the jury found that the defendants who had already settled were 30% responsible for the securities fraud, the court awarded only 70% of $9,554,000 (or $6,715,800) against the defendants who stood trial
 
 
 [39]
 Section 28(a) of the Exchange Act, upon which defendants rely in arguing that the plaintiffs received an impermissible double recovery, reads in relevant part:
 The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.
 15 U.S.C. Sec. 78bb(a).
 
 
 [40]
 The defendants, noting that the bonds still trade at close to par value, argue that the bondholders' possessory interest did not shrink because of Westside's bankruptcy. This argument, however, misses the mark; Westside bonds presumably would be trading at significantly above par value had Westside continued to pay the original interest rates
 
 
 [41]
 The classic example of a bondholder who alienates the interest payments from the possessory interest is one who sets up a trust arrangement (assuming the cestui has a legal right to the interest payments as well as an equitable right)
 
 
 [42]
 In fact, the expert proved only that the fraud reduced the value of the bonds to par value. Consequently, the fraud only reduced the profit which investors could have made from Westside bonds; it did not reduce the bonds' value to less than what the bondholders paid for them
 
 
 [43]
 That the terms of any given bond might differ dramatically from the terms of any other bond is of no consequence, since the terms of each bond were unambiguously established
 
 
 [44]
 Plaintiffs also introduced evidence that after Westside defaulted on its interest payments in October 1984, the class lost, as of the date of trial, an additional $3,402,146.60 in past-due interest payments
 
 
 [45]
 Of course, in light of our exoneration of WLJ on liability, this damage issue now can affect recovery only against Fryar
 
 
 [46]
 Compare State Farm Fire & Cas. Co. v. Estate of Caton, 540 F.Supp. 673, 680 (N.D.Ind.1982); In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig., 636 F.Supp. 1138 (C.D. Cal.1986) (holding that all RICO damages are compensatory) with Summers v. FDIC, 592 F.Supp. 1240 (W.D. Okla.1984) (holding that the trebled portion of RICO damages is penal)
 
 
 [47]
 Our result would be the same had we applied the Murphy three-pronged test. First, although the purpose of Sec. 1964(c) is to redress both public and private wrongs, the trebling component of that provision appears to be aimed primarily at remedying public wrongs. Second, recovery under Sec. 1964(c) obviously runs to the individual, a factor suggesting the statute is not penal. But finally, the authorized penalty is plainly disproportionate to the individual harm redressed, since it is trebled. See Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.")
 
 
 [48]
 In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made pursuant to known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant
 347 U.S. at 229, 74 S.Ct. at 451 (citations omitted). We have long held that "the integrity of the jury system is no less to be desired in civil cases." United States v. Harry Barfield Co., 359 F.2d 120, 124 (5th Cir.1966). See also Haley; Hobson v. Wilson, 737 F.2d 1 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); Butler.
 
 
 [49]
 455 U.S. at 214, 102 S.Ct. at 944 (quoting from the trial court's findings in People v. Phillips, 87 Misc.2d 613, 618-19, 384 N.Y.S.2d 906, 910 (1975))
 
 
 [50]
 See United States v. Littlefield, 752 F.2d 1429, 1431-32 (9th Cir.1985) (criticizing Pennell ); Haley, 802 F.2d at 1535 (distinguishing Phillips ); Butler, 822 F.2d at 1195-96 n. 2 (rejecting Pennell and concluding that "Remmer's allocation of the burden remains the law")
 
 
 [51]
 See, e.g., Owen v. Duckworth, 727 F.2d 643 (7th Cir.1984); United States v. Delaney, 732 F.2d 639, 643 (8th Cir.1984); United States v. Hines, 696 F.2d 722, 730-31 (10th Cir.1982); Hobson v. Wilson, 737 F.2d 1, 47-49 (D.C. Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985) (civil case)
 
 
 [52]
 Smith v. Phillips speaks to the propriety of questioning the jurors:
 Respondent correctly notes that determinations made in Remmer-type hearings will frequently turn upon testimony of the juror in question, but errs in contending that such evidence is inherently suspect. As we said in Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950), '[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' Id., at 171, 70 S.Ct., at 523. See also United States v. Reid, 12 How. 361, 366, 13 L.Ed. 1023 (1852).
 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7.
 
 
 [53]
 We note that Fryar has been convicted of using Terracina's uncle to offer Terracina a $10,000 bribe. United States v. Fryar, No. CR-87-60027-01 (W.D. La., conviction entered Mar. 14, 1988), appeal docketed, No. 88-4200 (5th Cir. Mar. 14, 1988)